[No. S008512. Nov. 20, 1989.]

JOHN DAVID BAKER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

806

COUNSEL

David A. Clare for Petitioner.

Diane C. Yu and Truitt A. Richey, Jr., for Respondent.

OPINION

**THE COURT.**—In this matter we review the recommendation of the Review Department of the State Bar Court that petitioner John David Baker

be disbarred. (Bus. & Prof. Code, § 6083, subd. (a); Cal. Rules of Court, rule 952(a).)[1] The disciplinary proceeding is based on stipulated facts. Our concern is whether petitioner has established that his rehabilitation from alcohol and cocaine dependency has progressed to the stage that disbarment is not reasonably necessary to protect the public.

On review of the uncontradicted evidence presented by petitioner that he has undergone a course of treatment, has remained sober for more than three years, and has resumed the practice of law without further incident, we conclude that disbarment is not presently warranted. However, in light of petitioner's concession that he has a genetic predisposition to addiction, and was no longer participating in either a treatment program or support group at the time of the hearing before the panel, a lengthy period of probation with strict conditions, including actual suspension of one year, supervision by a probation monitor, and participation in a program offering counseling and support for recovering addicts, will be required.

## I

Petitioner was admitted to the bar on May 31, 1979. He has no prior record of discipline.

This proceeding was initiated by an order to show cause filed by the Hearing Department of the State Bar Court on June 15, 1987, charging petitioner in 10 counts with violation of sections 6068, 6103, and 6106, as well as several of the Rules of Professional Conduct.

Petitioner engaged in a course of personal behavior which included the onset of alcohol abuse in 1981, and experimentation and eventual addiction to cocaine beginning in 1982. He nonetheless practiced without incident until September 1983, when the conduct underlying this proceeding commenced. All of the acts upon which the charges were based occurred in the period between September 1983 and September 1985. The facts underlying the charges are not disputed. The parties stipulated to the following:

COUNT 1: THE DYER MATTER

While representing Joseph Dyer in a dissolution proceeding, petitioner misappropriated to his own use $10,734.27, monies from the sale of community property of the Dyers that was being held in petitioner's trust account. Thereafter, in May 1984, petitioner moved without notifying opposing

---

[1] Unless otherwise indicated, all statutory references are to the Business and Professions Code.

counsel of his move. He failed to have mail forwarded, and as a result failed to receive or respond to a subpoena duces tecum by opposing counsel requiring production of records documenting the distribution of those monies.

In July 1985, Mr. Dyer, petitioner's client, unsuccessfully attempted to obtain from petitioner documents he entrusted to petitioner, and an accounting of the monies. In May 1985, Mr. Dyer had sought the help of the State Bar in obtaining his files, documents, and the accounting.

Thereafter, in an attempt to ameliorate the harm to his client, petitioner repaid $10,734.27. By agreement between Mr. Dyer, his new attorney, Mrs. Dyer, and her attorney, the funds were held in trust by another attorney. Ultimately they were properly disbursed pursuant to court order. Some of the files and documents were delivered to Mr. Dyer on August 27, 1985, and the remainder on September 18, 1985.

After the State Bar complaint was filed, petitioner paid Mr. Dyer interest of $1,600.

Count 2: The Clayton Matter

Donna Clayton retained petitioner to represent her in a dissolution matter on June 22, 1984. Thereafter, petitioner filed a petition for dissolution, filed an income and expense declaration with an order to show cause, and appeared at the hearing on the order to show cause on October 1, 1984.

Petitioner was hospitalized in February 1985. He realized that by reason of mental disorder he was incapable of handling his law practice and attempted to have other counsel represent the client or advised her to engage another attorney. She picked up her file from his office, took it to an attorney recommended by petitioner, but did not engage that attorney and returned the file to petitioner's office. Petitioner's wife then advised Ms. Clayton that petitioner would not be able to continue to represent her, but petitioner neither executed a substitution of attorney nor sought to be relieved as attorney of record.

Because petitioner failed to withdraw as counsel of record, notice that trial was set for June 11, 1985, was sent to his office address. Petitioner had not returned to his office following his hospitalization, however. As a result petitioner did not have actual knowledge of the hearing date and Ms. Clayton was not informed of the hearing.

Ms. Clayton called petitioner's office to request return of her files, but he did not deliver them in a timely fashion as he did not know she had

returned them to his office, and her requests did not reach him. Although she knew his home address and telephone, she did not contact him there.

### COUNT 3: THE ROBERTSON MATTER

In August 1984, Jack Robertson retained petitioner to represent him in a dissolution proceeding, and paid petitioner $117 for filing fees and $367 in attorney fees. Petitioner filed a petition for dissolution but wrote the check for filing fees from his business account rather than from a properly identified trust account. On October 1, 1984, the court sent notice to petitioner that fees were unpaid because his check had been returned twice for insufficient funds.

Because the check for filing fees bore an address from which petitioner had moved in May 1984, the notice was sent to the former address. The filing of the dissolution petition was then voided by the court pursuant to Code of Civil Procedure section 411.20. Nonetheless, petitioner, without actual knowledge that the filing had been voided, falsely advised his client by letter on October 9, 1984, that the action had been filed and that his wife's default might be entered if she did not respond. On November 19, 1984, petitioner advised his client by letter that a trial date had been set for December 6, 1984. On December 6, 1984, petitioner advised Mr. Robertson by telephone that his appearance would not be necessary. The court took the matter off calendar when petitioner failed to submit necessary documentation.

In March 1985, Mr. Robertson went to petitioner's office and learned that petitioner had vacated the office. Petitioner had not informed him of this act. Mr. Robertson obtained new counsel. Petitioner did not return the unearned fees. He misappropriated the monies advanced by Mr. Robertson for costs.

### COUNT 4: THE ZUNIGA MATTER

Loretta Zuniga retained petitioner on October 11, 1984, to represent her in a dissolution, paying him $600 for all attorney fees and costs. In December 1984, petitioner gave Ms. Zuniga a copy of a petition for dissolution that he told her had been filed on December 3, 1984. However, the check he had delivered to the court for filing fees was drawn on his business account rather than a trust account, and the court had, without petitioner's actual knowledge, refused to file the petition because the check had been returned three times for insufficient funds. A notice of unpaid fees sent by the court on December 26, 1984, informing petitioner that the filing had been voided pursuant to Code of Civil Procedure section 411.20, was mailed to the

address on the check, a location petitioner had vacated in May 1984. Petitioner assured Ms. Zuniga her matter was progressing. The representations about her case were false since the court, without petitioner's actual knowledge, had voided documents filed on her behalf.

After the court voided the filing, Ms. Zuniga's husband filed a petition for dissolution. On August 23, 1985, petitioner was served with notice of entry of judgment reflecting that judgment by default had been entered on July 30, 1985. Petitioner did not have actual notice of the entry of default because he had not returned to the office after his hospitalization. He did not notify Ms. Zuniga of the entry of her default. She received notice of entry of the default judgment from her husband's attorney.

Petitioner did not return any unearned fees, and misappropriated to his own use the monies advanced to him for costs.

COUNT 5: THE KERMANE MATTER

Bruce Kermane retained petitioner on October 16, 1984, to represent him at a hearing to be held on October 24, 1984, on an order to show cause issued in a dissolution proceeding. Kermane paid petitioner $350. Petitioner appeared at the hearing, agreed to payment by Kermane of temporary spousal support of $200 per month, and continued the matter to November 26, 1984.

Petitioner forwarded the support check given him by his client on December 3, 1984, to opposing counsel, but failed to endorse it. The check was returned to him on or about February 5, 1985, but petitioner took no action and the check was not negotiated.

Opposing counsel served interrogatories on petitioner on November 8, 1984. Petitioner failed to return any of the telephone calls from opposing counsel inquiring about the status of the interrogatories between November 8, 1984, and December 27, 1984. He also failed to provide answers to the interrogatories, although his client had provided him with the responses.

The hearing scheduled for November 26, 1984, was continued to January 3, 1985, on petitioner's representation to the court that he was ill, and on January 3, 1985, was continued to January 31, 1985, on petitioner's representation that he had car problems.

On January 10, 1985, the court ordered petitioner to respond to the interrogatories by January 30, 1985, and imposed sanctions of $450 after

finding that his failure to comply was without substantial justification. Petitioner did not pay the sanctions.

The hearing scheduled for January 31, 1985, was continued to March 4, 1985, at petitioner's request. His client was unable to reach petitioner thereafter and was forced to proceed in propria persona.

## COUNT 6: THE MUNSON MATTER

Wesley Munson retained petitioner on May 25, 1984, to obtain a restraining order to protect Mr. Munson and his wife from their son. He paid petitioner $443 for all attorney fees and costs. Petitioner immediately prepared the papers necessary to obtain a temporary restraining order. Mr. Munson executed the documents on May 31, 1984, but thereafter asked petitioner not to obtain the order and requested return of the money advanced for costs.

Petitioner did not return the advanced costs and misappropriated to his own use the monies advanced to him for costs.

## COUNT 7: THE CORTEWAY MATTER

Mardee Corteway retained petitioner on December 27, 1984, to file a joint petition for summary dissolution on behalf of herself and her husband. She paid $165 to cover the filing fee of $101 and all attorney fees. The couple lost the first petition sent to them for execution. Petitioner prepared a second petition which they executed on February 27, 1985, and returned to petitioner. He then wilfully failed to file the document as he was hospitalized at the time. He subsequently misappropriated the monies advanced for the filing fee.

In March 1985, petitioner attempted to avoid prejudice to the Corteways caused by his incapacity by having the files and documents delivered to another attorney who, in turn, delivered them to the Corteways. They filed the petition on their own behalf on June 26, 1985.

## COUNT 8: THE HILL MATTER

Glenda Hill retained petitioner on January 7, 1985, to obtain payment of arrearages in child support of $4,650 from her ex-husband who was then living in Louisiana, and to obtain a modification of the child support award. She paid him $500 for all fees and costs. On January 8, 1985, petitioner wrote to his client's ex-husband about the arrearages and the request to

modify child support. The letter stated that an action would be brought if he did not respond within 15 days.

During the next month Ms. Hill was unable to contact petitioner by phone. When she did reach him in early February he stated he would file the required documents and asked her to make an appointment to sign the documents. When she did so on February 28, 1985, petitioner's secretary informed her that petitioner had been hospitalized on February 20, 1985, and the date of his return was unknown. Ms. Hill wrote to him on March 1, 1985, stating that if she did not hear from him within 15 days she would expect return of the funds and her file. Petitioner did not return to his office, did not read the letter, and did not respond to it in any way.

Petitioner performed no services for Ms. Hill other than sending the initial letter to her ex-husband, failed to return either the unearned fees or the files and documents in his possession, and misappropriated to his own use the $15 advanced to him for costs.

COUNT 9: THE BOLOURCHI MATTER

Mojtaba Bolourchi retained petitioner on February 15, 1985, to represent him in a dissolution matter. He paid petitioner $140 for filing fees and costs, and agreed to pay an additional $200 for attorney fees. Petitioner did not deposit the sum advanced for filing fees and costs in a trust account, and misappropriated to his own use those advanced for costs.

Petitioner performed no services on behalf of Mr. Bolourchi other than determining the status of a juvenile court proceeding. He referred Mr. Bolourchi to another attorney.

COUNT 10: THE MEADOWS MATTER

Donald Meadows retained petitioner on February 11, 1985, to represent and defend him in a civil suit, and paid petitioner a $500 advance against attorney fees. The following day, opposing counsel agreed that the defendant's default would not be taken until petitioner had an opportunity to consult with Mr. Meadows and contact opposing counsel. Petitioner confirmed this conversation in writing on that day.

Petitioner performed no services on behalf of his client. He was hospitalized during that month and did not return to the office or to the practice of law. In June 1985, opposing counsel informed Mr. Meadows that he had been unable to communicate with petitioner about the pending matter, and

Mr. Meadows was unsuccessful in his subsequent attempts to reach petitioner.

Petitioner failed to return the unearned fees owed to Mr. Meadows.

## II

### FINDINGS OF THE STATE BAR

Based on the stipulated facts, which it adopted, the State Bar Court found that petitioner had misappropriated client funds in each of the 10 counts, the most serious being the Dyer matter in which trust funds of $10,734.27 had been diverted. In the remaining counts a total of $4,098 had been misappropriated. Although the $10,734.27 had been repaid with interest, none of the other clients had been reimbursed.

The filing of a petition for dissolution on behalf of one client had been stricken because the check drawn on petitioner's personal/business account had not cleared. That client suffered a default judgment when her husband subsequently filed a petition for dissolution.

Petitioner moved his office without informing his clients, failed to return files and documents or to file substitutions of attorney or motions to be relieved, and in one instance failed to appear in court in response to a notice of trial.

Petitioner's misfeasance was a direct result of his addiction to cocaine and alcohol.

## III

### CONCLUSIONS OF LAW

The State Bar Court concluded that in each of the 10 counts petitioner had committed wilful violations of sections 6068, 6103, and 6106.

Section 6068 sets forth numerous duties of an attorney.[2] ■ The only duty specified therein that petitioner's conduct arguably violated in each of

---

[2] At the time of the charged violations, section 6068 specified as the duties of an attorney: support for the United States Constitution; maintaining respect due to courts and judicial officers; counseling and maintaining only causes that appear legal or just; employment only of means consistent with truth and avoidance of those that would mislead the court by artifice or false statement of fact or law; maintaining the confidential nature of client communication; abstaining from "offensive personality" and avoiding injury to the reputation of a party or witness; not encouraging commencement or continuance of an action for improper motive; and never rejecting for personal considerations the defense of the "defenseless or the oppressed."

the 10 counts was that set out in subdivision (m) requiring the attorney "[t]o respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney had agreed to provide legal services."

That subdivision was not added to section 6068, however, until 1986. (Stats. 1986, ch. 475, § 2, pp. 1772-1773.)

Section 6103 provides: "A wilful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

Since this section does not define a duty or obligation of an attorney, but provides only that violation of his oath or duties defined elsewhere is a ground for discipline, petitioner did not violate this section.

Section 6106 provides: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension.

"If the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding is not a condition precedent to disbarment or suspension from practice therefor."

■ The only arguable bases for finding violations of this section are in petitioner's misappropriation of funds advanced for filing fees and costs, and his issuance of a check without sufficient funds in his account to cover it. ■ ■ ■ ■ The former constitutes moral turpitude within the meaning of this section since misappropriation of another's property may reflect "abiding disregard" of a fundamental rule of ethics—common honesty. (*Hamilton* v. *State Bar* (1979) 23 Cal.3d 868, 876 [153 Cal.Rptr. 602, 591 P.2d 1254]; *Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 576-577 [119 Cal.Rptr. 335, 531 P.2d 1119].)[3] If petitioner knowingly issued the

---

[3] Whether conduct may properly be characterized as an act involving "moral turpitude" is a question of law to be determined by the court. (*Chadwick* v. *State Bar* (1989) 49 Cal.3d 103, 109 [260 Cal.Rptr. 538, 776 P.2d 240].) Because the right to practice a profession is sufficiently important to warrant legal and constitutional protection, the term must be given a meaning and content relevant to the attorney's fitness to practice. (*Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288]; *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 239 [82 Cal.Rptr. 175, 461 P.2d 375].)

We noted in *Chadwick, supra,* 49 Cal.3d 103, as we have in other cases, that the term cannot be defined with precision. Any crime or misconduct reflecting dishonesty, particularly

check that was returned in the Zuniga matter, that act may also be one of moral turpitude.

The stipulated facts do not establish a violation of this section as to counts 2, 5, and 10, however. (See *In re Higbie* (1972) 6 Cal.3d 562, 569-573 [99 Cal.Rptr. 865, 493 P.2d 97].) ■ Once again we are constrained to call to the attention of the State Bar Court the importance of identifying with specificity both the rule or statutory provision that underlies each charge and the manner in which the conduct allegedly violated that rule or statutory provision. While petitioner here does not complain of any due process violation in lack of notice, this specificity is also essential to meaningful review of the recommendation of the State Bar Court. (See *Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962, 968 [239 Cal.Rptr. 675, 741 P.2d 172, 65 A.L.R.4th 1]; *Maltaman* v. *State Bar* (1987) 43 Cal.3d 924, 931 [239 Cal.Rptr. 687, 741 P.2d 185].)

The State Bar Court concluded that in each count except count 7 petitioner also wilfully violated rules 2-111, 6-101, and 8-101 of the Rules of Professional Conduct approved by this court and filed on December 31, 1974.[4] The conduct in count 7 was held to wilfully violate only rules 6-101 and 8-101.

Rule 2-111 provides, in pertinent part, that an attorney shall not withdraw from employment without taking those reasonable steps necessary to avoid prejudice to a client, and upon withdrawal shall refund any unearned fee, and must obtain court permission to withdraw as required by the rules of the court. (Rule 2-111(A)(1)-(4).) The rule also requires an attorney to withdraw from employment if a mental or physical condition make it unreasonably difficult to carry out the employment effectively. (Rule 2-111(B)(3).) It is not clear, however, whether the charges and findings encompassed violation of the mandatory withdrawal provision, because once again the State Bar Court has failed to allege or state the manner in which petitioner's conduct violated the rule. ■ ■ ■ ■ ■ The stipulated facts arguably establish either withdrawal from employment or failure to withdraw when required, and failure to return unearned fees.[5]

---

when committed in the course of his practice, is clearly relevant to the fitness of an attorney to continue to practice law, and thus is conduct involving moral turpitude for purposes of State Bar disciplinary proceedings.

[4] New Rules of Professional Conduct became operative on May 27, 1989; all further references are to the former rules, hereafter referred to as rules.

[5] Although petitioner does not challenge the findings and conclusion of the State Bar Court, their validity is relevant to the discipline to be imposed.

It is doubtful whether petitioner "withdrew" from employment since there is no evidence of an intent to do so. Rather, as in *Guzzetta* v. *State Bar, supra,* 43 Cal.3d at page 979, peti-

Rule 6-101 provides, inter alia: "A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently." We infer that it is this provision that petitioner was charged with violating and found to have violated. The stipulated facts establish conduct violating this rule.

Rule 8-101 requires, inter alia, that funds received or held on behalf of a client, including those received from a client as advances for costs and expenses, be deposited in a trust account, and that there be no commingling of trust account funds with other monies. (Rule 8-101(A).) It also mandates the return, on request, of any property entrusted to the attorney to which the client is entitled. (Rule 8-101(B).)

The stipulated facts establish that the funds received by petitioner on behalf of Mr. and Mrs. Dyer, in the matter charged in count 1, were placed in petitioner's trust account. Some of those funds were subsequently misappropriated. ■ Implicit in the requirement that client funds be held in a trust account is the duty of the attorney to use client funds held in a trust account only for the purposes for which the funds were entrusted to him. Misappropriation of the funds, therefore, is a violation of rule 8-101(A).

The stipulated facts reflect a violation of rule 8-101(B) in count 2, when petitioner failed to return to Ms. Clayton, on her request, the files and documents to which she was entitled.

As to counts 3, 4, 6, and 8, the facts establish receipt by petitioner of funds to be used for filing fees and/or costs, and the subsequent misappropriation of those funds. The facts do not indicate that petitioner failed to deposit the monies received from these clients in a trust account. However, if they were not deposited in a trust account, or if they were deposited in a trust account and subsequently misappropriated, a violation of this rule occurred. Another violation of rule 8-101(B) may have occurred in the Hill matter (count 8), moreover, as petitioner failed to return, on request, the $15 Ms. Hill had advanced to him for costs.

tioner's failure to perform the services for which he was retained appears to be an intentional or reckless failure to perform legal services competently (rule 6-101(A)(1)), rather than a withdrawal from employment.

However, when petitioner ceased coming to his office and could not be contacted by his clients, he effectively withdrew his services. The requirement of rule 2-111(A)(2) that requires an attorney to take steps to avoid prejudice to his client prior to withdrawing, and to return all papers and properties to the client, may reasonably be construed to apply when an attorney ceases to provide services, even absent formation of an intent to withdraw as counsel for the client.

The stipulated facts do not reflect a violation of rule 8-101 in petitioner's handling of the Kermane matter in count 5. He did not receive or hold any funds for the benefit of his client. He received a check from his client to pay child support and failed to endorse it when it was forwarded to opposing counsel. The facts do not indicate that the check was ever negotiated.

The stipulated facts do establish that in the Bolourchi matter charged in count 9, petitioner wilfully failed to deposit the $140 he received as an advance for filing fees and costs into a trust account, and that he misappropriated the funds.

In the Meadows matter charged in count 10, petitioner received only an advance against attorney fees. The stipulated facts do not establish a violation of rule 8-101 in that matter.

Violations of rule 8-101 are established therefore as to only seven, rather than nine, of the ten counts.

## IV

## ■ ■ ■ ■ MITIGATING EVIDENCE[6]

Petitioner entered the United States Navy at age 17 following high school graduation in 1966. He served as a field corpsman with a Marine infantry unit in Vietnam for six months until he was injured in combat and was sent to a psychiatric hospital in Japan. He was then transferred to the United

---

[6] We have summarized here the evidence offered by petitioner in "mitigation" of his conduct. In the context of a State Bar disciplinary proceeding, evidence of drug or alcohol abuse, or addiction, is "mitigating" only if, and to the extent that, it suggests that the circumstances in which the attorney's misconduct occurred were such that the misconduct will not recur. (*Twohy* v. *State Bar* (1989) 48 Cal.3d 502, 514-515 [256 Cal.Rptr. 794, 769 P.2d 976].)

As is apparent here, some of this evidence is in the nature of explanatory material, as opposed to evidence that might lessen the need for or degree of discipline. Possession and use of controlled substances without a prescription is itself unlawful and certainly cannot mitigate culpability for attorney misconduct. When such use leads to addiction and affects an attorney's practice, the addiction is relevant to the threat his continued practice of law poses to his clients, but does not "mitigate." Similarly, an attorney's alcoholism is not a mitigating factor when that condition is related to his violations of the standards of professional conduct. A physical, mental, or emotional condition that adversely affects an attorney's ability to practice competently and/or ethically may, if uncorrected, require disbarment in order to protect the public. (See *In re Lamb* (1989) 49 Cal.3d 239, 246-247, fn. 6 [260 Cal.Rptr. 856, 776 P.2d 765], and cases cited.)

By contrast, however, evidence that petitioner was not properly diagnosed when he was released from his initial treatment program, and, as a result, was not made aware of his genetic predisposition to addiction, is mitigating. It lends support to his claim that, having learned about his condition, he will continue to abstain totally from drugs and alcohol, will remain sober, and will not again relapse into the behavior that led to his past misconduct.

States where he worked as a corpsman in a psychiatric hospital for the remainder of his enlistment.

In 1972 he attempted suicide, and was treated for four years thereafter for depression. Treatment included medication and shock therapy.

Petitioner enrolled at Long Beach State in 1973, and worked nights at a neuropsychiatric institute to support himself and his family. Following his admission to practice in 1979, he worked for his cousin, doing family law for six months, and then joined a coworker in opening a family law practice. The partnership continued until 1983 when his partner became house counsel for a realty firm.

Petitioner first used cocaine in 1980, but then thought it a waste of time and money. He tried it again, however, in 1981 or 1982, when a client paid his fee with cocaine. It made him feel euphoric and more self-confident. He began using cocaine regularly in 1982, supplied by people whose criminal defense he handled. Before his hospitalization in 1983 he was using half a gram a day, borrowing money from family members to pay for the drug, and neglecting his practice. His working hours were spent looking for cocaine. He also drank more when using cocaine, but did not get drunk at home or around his wife and children.

In December 1983, petitioner admitted himself to Memorial Hospital in Long Beach. The $10,734 misappropriated in the Dyer matter was taken at this time. Petitioner believed that he would "have it all together" upon his release from the hospital and would be able to repay the money. He also anticipated receiving a fee adequate to repay the funds from a personal injury matter he had referred to associate counsel.

Petitioner was hospitalized for four weeks. He was diagnosed as a manic/depressive at the time he was released, and lithium carbonate was prescribed. He used the medication and participated in an Alcoholics Anonymous program for several months, but had a relapse in May 1984. Within a month he was again using cocaine and drinking. In February 1985 he made another suicide attempt after he had lost a big case, his wife had thrown him out and was going to seek a divorce, and an adoption he handled had failed. He had no money to live on and took money from clients.

Petitioner then entered the drug and alcohol dependency unit at Long Beach Memorial Hospital, and again began an Alcoholics Anonymous program, attending meetings four times a day. He briefly attended a Cocaine Anonymous program also, but the programs were the same. After three months he began painting houses for friends, while continuing thrice daily

Alcoholics Anonymous meetings. He then obtained employment from a friend, driving a truck. He worked a full day at heavy labor, attending the meetings in the evening. He handled cash for his employer, became a salesman, and started to do some legal work for the company.

After driving a truck for one year, petitioner volunteered as a temporary judge in the municipal court, as he has done once or twice a month since then. In September 1986 he resumed practice, working with his brother-in-law in a personal injury practice. He is not paid a salary, but receives a share of the proceeds if the case settles, or goes to judgment. He accepts criminal cases on assignment from the municipal court. At the time of the hearing he had at least three jury trials set each week, and averaged about one misdemeanor jury trial per week. As a result he is able to attend only one Alcoholics Anonymous meeting per week, but he had been sober since February 1985.

At the time of the hearing in March 1988, however, petitioner had not had an Alcoholics Anonymous sponsor for six months, and did not sponsor other people. Although he was working from 8 a.m. to 10 p.m., he was trying to set aside one day a week as a family day. He has not taken lithium since he became sober, and has had no mood swings.

Petitioner married in 1967. He and his wife have three sons. She worked two jobs to help save their home, but they have been unable to afford a home since their move in 1982. Petitioner's wife testified that she had not seen him take drink or use drugs since February 1985. He now seems happy in practicing law, whereas he was always worried about the clients in the family law practice.

Petitioner's employer, who is also his brother-in-law, testified that petitioner is now a markedly different person who is extremely diligent in his practice, never misses work, and is completely rehabilitated. This witness had not seen petitioner intoxicated and had not seen him consume alcohol since his release from the hospital in 1985.

Both petitioner's expert, Dr. O'Connor, and the State Bar expert, Dr. Sandor, concluded that petitioner has abstained from intoxicants since his hospitalization in 1985. Dr. Sandor testified that he had no doubt of petitioner's sincerity in wanting to abstain from alcohol and drugs. Dr. O'Connor testified that petitioner's stress level is less, and he now appears to enjoy the practice of law, which he had despised prior to February 1985. Both witnesses noted a supportive family environment as contributing to petitioner's maintenance of sobriety, and both concluded that he is presently fit to practice law. Dr. O'Connor placed petitioner in the "highest

possible percentile for continued recovery." Both recommended that he continue the recovery program, attending Alcoholics Anonymous meetings, and that he be monitored for substance abuse with random urine testing. They opined that the risk of relapse is minimal for petitioner with such a program.

V

DISCIPLINE

As is apparent, petitioner's violations of his duties as an attorney were serious. He has engaged in conduct involving moral turpitude in the practice of law by misappropriating funds from several clients, and he has failed to perform services for which he was retained, abandoning his clients without notice.

Much of the evidence petitioner offered at the hearing helped to explain his conduct, but was not mitigating. That evidence does reflect, however, that petitioner ceased practicing law and voluntarily sought treatment when he recognized the extent of his addiction. He made restitution to Mr. Dyer prior to learning of his client's complaint to the State Bar, and he has cooperated in the disciplinary proceedings. He has contributed substantial amounts of time as a pro bono temporary judge, and there have been no complaints regarding his conduct since he resumed the practice of law. The evidence of his continued sobriety is uncontradicted.

The hearing panel, a retired superior court judge, recommended that petitioner be suspended from the practice of law for three years; that execution be suspended and petitioner be placed on probation for five years; and that the conditions of probation include an actual suspension of sixty days or until he satisfies a probation monitor that he has made all required restitution. Other proposed conditions of probation required continued abstention from alcohol, cocaine, and any other restricted drug; cooperation with a probation monitor; active participation in Alcoholics Anonymous, the hospital recovery program, or such other program approved by the probation monitor; compliance with rule 955 of the California Rules of Court; and the filing of compliance reports with the State Bar as directed by the probation monitor.

A seven-person majority of the review department recommends disbarment, one member noting that to do otherwise would be inconsistent with

actions taken in similar cases,[7] another noting that petitioner had failed to submit "written corroboration" of his claimed rehabilitation. Five members dissented on grounds the discipline was excessive, three of whom noted their belief that petitioner has been rehabilitated and is not a danger to the public.

## VI

### DISPOSITION

 While giving great weight to the recommendation of the review department, this court must exercise its independent judgment in determining the discipline to be imposed. (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]; *In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244].) The court's principal concern in disciplinary proceedings is protection of the public and preservation of confidence in the legal profession, interests served by maintaining the highest possible professional standards for attorneys. (*Chadwick* v. *State Bar, supra,* 49 Cal.3d 103, 111; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 132 [202 Cal.Rptr. 349, 680 P.2d 82]; *Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47].)

 This matter differs in several respects from other recent disciplinary proceedings that have come before the court in which serious misconduct resulted from an attorney's substance abuse. Unlike the petitioner in *Twohy* v. *State Bar, supra,* 48 Cal.3d 502, this petitioner has no prior record of discipline. He has cooperated with the State Bar, and made restitution in the Dyer matter prior to learning that disciplinary proceedings had been initiated. His misconduct occurred over a relatively short period of time, during which petitioner recognized his inability to continue his practice and ceased doing so until he had voluntarily undergone rehabilitation.

Petitioner has apparently abstained from alcohol and drugs for a period of four years, and has practiced law without incident for almost three years since resuming practice in September 1986.

---

[7] We recognize the importance of consistency in the imposition of discipline, and have approved reference to the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V) as a means by which to achieve that goal in determining the sanction that may be appropriate for particular types of misconduct.

The overriding goal of disciplinary proceedings, however, is the protection of the public. In the individual case, the circumstances in which the misconduct occurred or subsequent efforts by the attorney to correct the condition that precipitated the misconduct may demonstrate that the misconduct will not likely recur. In such cases, protection of the public may not require the sanction recommended under those standards. "The discipline ultimately imposed must be consistent with its purpose, that of protecting the public, the courts and the legal profession from unfit practitioners." (*In re Young* (1989) 49 Cal.3d 257, 266 [261 Cal.Rptr. 59, 776 P.2d 1021].)

■ When an attorney's misconduct is the product of a physical or mental disorder, or substance abuse, the attorney bears a heavy burden in demonstrating by clear and convincing evidence that the precipitating condition has been corrected or its effects overcome insofar as they are related to his fitness to practice. He "must prove that the risk of continued substance abuse causing future acts of misconduct is virtually nonexistent." (*Twohy* v. *State Bar, supra,* 48 Cal.3d 502, 514.) If he fails to do so, the court must assume that disbarment is necessary to protect the public. This is true even when the misconduct occurred over a relatively short period of time and involved relatively minor injury to the attorney's clients.

■ Our concern in this case, therefore, has been whether petitioner has established rehabilitation adequate to ensure that, with probation monitoring, his substance abuse and psychological disability will not recur. The answer is not free from doubt. Petitioner was in practice for only a short time before his pattern of substance abuse began. He has no prior "track record" of successful practice under the pressures of an active law practice. And, after undergoing rehabilitation, he has permitted his current practice to become so time-consuming that he is not able to continue full participation in the Alcoholics Anonymous program, and has not enrolled in any other program that assists substance abusers in maintaining sobriety. He has, however, offered expert testimony that he has overcome his addiction and will be able to maintain his rehabilitation. That opinion is corroborated by evidence that petitioner has maintained his sobriety since his last hospitalization, has changed the nature of his practice to one that is less stressful, and has practiced without further complaint for three years.

Petitioner's rehabilitative efforts appear to have been successful thus far. We conclude, therefore, that disbarment is not warranted. Doubtless, however, the pendency of these proceedings has been a strong incentive to reformation, and we are not satisfied that absent such incentive and monitored supervision petitioner would be able to maintain his achievement. To deter future misconduct, suspension is warranted, and to provide further protection to the public, we will permit petitioner to resume practice only under closely monitored conditions of probation.

Accordingly, it is ordered that John David Baker be suspended from the practice of law for a period of three years from the date this opinion is final; and that execution of the order of suspension be stayed and petitioner be placed on probation, with a probation monitor referee to be assigned pursuant to rules 610 and 611 of the State Bar Rules of Procedure, for a period of five years, subject to the following conditions: (1) That for the first year of said probationary period or until such later time as he has satisfied the probation monitor referee that he has repaid all items of restitution, includ-

ing unearned fees in an amount to be determined by the probation monitor referee, petitioner shall be actually suspended from the practice of law in the State of California;

(2) That he comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

(3) That he abstain from the use of alcohol, cocaine, or any other restricted drug, and shall state his compliance in any report he may be required to render by the probation monitor referee;

(4) That he submit, as reasonably required by the probation monitor referee, to periodic and random drug testing;

(5) That he become and remain active in Alcoholics Anonymous, and/or the Coastview Hospital Recovery Program, or such other program or programs as directed by the probation monitor referee;

(6) That he file with the State Bar such other reports concerning his compliance with the conditions of probation as directed by the probation monitor referee;

(7) That he comply with the provisions of rule 955 (a) of the California Rules of Court within 30 days of the date on which this order becomes final, and file with the Clerk of the Supreme Court within 15 days thereafter an affidavit as provided for in paragraph (c) of said rule showing compliance; and

(8) That he take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners during the period of his actual suspension from the practice of law.

By this order John David Baker is referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. He shall promptly review the terms and conditions of his probation with the probation monitor referee to establish a manner and schedule of compliance, consistent with these terms of probation. During the period of probation, he shall furnish such reports concerning his compliance as may be requested by the probation monitor referee. He shall cooperate fully with the probation monitor referee to enable the monitor referee to discharge his/her duties pursuant to rule 611, Rules of Procedure of the State Bar.

At the expiration of the period of probation, if he has complied with the terms of probation, the order suspending John David Baker from the prac-

tice of law for a period of three years shall be satisfied and the suspension terminated.

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

Kaufman, J., concurred in the order only.

Petitioner's application for a rehearing was denied January 18, 1990.