[No. S041048. Sept. 1, 1995.]

In re IVAN O. B. MORSE on Discipline.

## COUNSEL

Hughes & Associates, Ralph D. Hughes, C. Timothy Genovese, Morse & Associates and Aaron M. Gumbinger for Petitioner.

Diane C. Yu, Richard J. Zanassi and Jill A. Sperber for Respondent.

## OPINION

**THE COURT.\***—During a period of more than four years, Attorney Ivan O. B. Morse (Morse) mailed to the public approximately four million advertisements offering assistance in the filing of homestead declarations. The Review Department of the State Bar Court (review department) found

---

*\*Before Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., George, J., and Kremer, J.†*

†Presiding Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Acting Chairperson of the Judicial Council.

that Morse had engaged in a mass mailing of unlawful, misleading advertisements. The review department recommended a one-year stayed suspension and a three-year probation, conditioned on a sixty-day actual suspension. Morse petitioned this court for review, contending, among other things, that Business and Professions Code section 17537.6 is unconstitutionally vague, that he did not violate section 17537.6, and that the recommended discipline is excessive.

As we shall explain, we reject Morse's claim that he did not commit misconduct. His arguments in that regard have been previously rejected by a superior court, a Court of Appeal, a State Bar hearing judge, and the review department. The more significant issue is whether the recommended discipline is appropriate. We conclude it is not. In light of the scope of Morse's misconduct, numerous aggravating factors, and, most importantly, the need to protect the public, we conclude that the review department's recommendation is inadequate. We therefore increase the period of actual suspension to three years, subject to a possible reduction to two years. As we shall explain, the reduction is contingent on Morse's timely and full payment of a superior court judgment against him for penalties and restitution in an action related to this proceeding.

FACTS

I. *Background*

From January 1988 until late 1992, Morse mailed to California property owners approximately four million copies of a solicitation, entitled "homestead information sheet," which offered assistance in the filing of homestead declarations. (A copy is set forth as appendix A to this opinion.) As a result of responses to the solicitation, Morse prepared homestead declarations for 95,000 to 100,000 persons.

Before he began mailing these advertisements, Morse was aware of Business and Professions Code section 17537.6, which requires that a person offering to prepare a homestead declaration make important disclosures, have the notarized declaration promptly recorded, pay all notarization and recordation fees, and charge no more than $25 for all services, including the fees.[1] Morse testified that he believed these requirements did not apply to

---

[1] All further references to statutory sections are to the Business and Professions Code unless otherwise indicated. Section 17537.6 states:

"(a) It is unlawful for any person to make any untrue or misleading statements in any manner in connection with the offering or performance of a homestead filing service. For the purpose of this section, an 'untrue or misleading statement' means and includes any representation that any of the following is true:

him because section 17537.6 exempts services performed by an attorney for a client who has retained the attorney. He also testified that he had sought the advice of another attorney about the applicability of section 17537.6.

Initially, Morse charged $30 for his services, which did not include having declarations notarized and recorded. He reduced the charge to $18 in April or May 1988 and raised it to $20 in 1991. Although he received about $1.9

"(1) The preparation or recordation of a homestead declaration will in any manner prevent the forced sale of a judgment debtor's dwelling.

"(2) The preparation or recordation of a homestead declaration will prevent the foreclosure of a mortgage, deed of trust, or mechanic's lien.

"(3) Any of the provisions relating to the homestead exemption set forth in Article 4 (commencing with Section 704.710) of Chapter 4 of Division 2 of Title 9 of Part 2 of the Code of Civil Procedure are available only to persons who prepare or record a homestead declaration.

"(4) A homestead declaration is in any way related to the obtaining of any applicable homeowner's exemption to real property taxes.

"(5) The preparation or recordation of a homestead declaration is required by law in any manner.

"(6) The offeror of the homestead filing service has a file or record covering a person to whom a solicitation is made.

"(7) The offeror of the homestead filing service is, or is affiliated with, any charitable or public service entity unless the offeror is, or is affiliated with, a charitable organization which has qualified for a tax exemption under Section 501(c)(3) of the Internal Revenue Code.

"(8) The offeror of the homestead filing service is, or is affiliated with, any governmental entity. A violation of this paragraph includes, but is not limited to, the following:

"(A) The misleading use of any governmental seal, emblem, or other similar symbol.

"(B) The use of a business name including the word 'homestead' and the word 'agency,' 'bureau,' 'department,' 'division,' 'federal,' 'state,' 'county,' 'city,' 'municipal,' 'California,' or 'United States,' or the name of any city, county, city and county, or any governmental entity.

"(C) The use of an envelope that simulates an envelope containing a government check, tax bill, or government notice or an envelope which otherwise has the capacity to be confused with, or mistaken for, an envelope sent by a governmental entity.

"(b)(1) It is unlawful to offer to perform a homestead filing service without making the following disclosure:

"THIS HOMESTEAD FILING SERVICE IS NOT ASSOCIATED WITH ANY GOVERNMENT AGENCY.

"YOU DO NOT HAVE TO RECORD A HOMESTEAD DECLARATION.

"RECORDING A HOMESTEAD DECLARATION DOES NOT PROTECT YOUR HOME AGAINST FORCED SALE BY A CREDITOR. YOU MAY WISH TO CONSULT A LAWYER ABOUT THE BENEFITS OF RECORDING A HOMESTEAD DECLARATION.

"IF YOU WANT TO RECORD A HOMESTEAD, YOU CAN FILL OUT A HOMESTEAD DECLARATION FORM BY YOURSELF, HAVE YOUR SIGNATURE NOTARIZED, AND HAVE THE FORM RECORDED BY THE COUNTY RECORDER.

"(2) The disclosure specified in paragraph (1) shall be placed at the top of each page of every advertisement or promotional material disseminated by an offeror of a homestead filing service and shall be printed in 12-point boldface type enclosed in a box formed by a heavy line.

"(3) The disclosure specified in paragraph (1) shall be recited at the beginning of every oral solicitation and every broadcast advertisement and shall be delivered in printed form as

million for preparing homestead declarations, his net profit was only $150,000 to $200,000. When asked about this relatively small profit margin, he testified that he had used the mailings to increase the economic base of his practice.

Morse used a firm, the Document Process Center (DPC), to obtain the names and addresses of persons who filed trust deeds, as well as the names of the lenders and the mortgage balances involved, and to market his homestead declaration advertisements. Although Morse did not initially operate on a statewide basis, he began in 1989 to obtain information about each trust deed filed in California.

The DPC sent a package of documents to each prospective customer by bulk mail in a plain white envelope having a plastic window. All that a recipient could see through the window was the name of the recipient's mortgage lender and the recipient's own name and address on an insert. The other documents in the envelope were the "homestead information sheet," a "retainer/information form," and a return envelope addressed to DPC. After Morse received telephone calls in early 1988 from persons who believed that he was affiliated with their lenders, Morse added the sentence "MORSE & ASSOCIATES IS NOT AFFILIATED WITH ANY LENDING INSTITUTIONS" to the bottom of the back side of the "homestead information sheet." He also placed the phrase "PRIORITY ADVERTISMENT [*sic*]" under the name of the recipient's mortgage lender on the insert, so that the phrase was visible through the envelope's plastic window.

---

prescribed by paragraph (2) before the time each person who responds to the oral solicitation or broadcast advertisement is obligated to pay for any service.

"(c) In addition to any other service, every offeror of a homestead filing service shall deliver each notarized homestead declaration to the appropriate county recorder for recordation as soon as needed or required by a homestead declarant, but no later than 10 days after the homestead declaration is notarized. The offeror of the homestead filing service shall pay all fees charged in connection with the notarization and recordation of the homestead declaration.

"(d) No offeror of a homestead filing service shall charge, demand, or collect any money until after the homestead declaration is recorded. The total amount charged, demanded, or collected by an offeror of a homestead filing service, including all fees for notarization and recordation, shall not exceed twenty-five dollars ($25).

"(e) For the purposes of this section, the following definitions apply:

"(1) 'Homestead filing service' means any service performed or offered to be performed for compensation in connection with the preparation or completion of a homestead declaration or in connection with the assistance in any manner of another person to prepare or complete a homestead declaration. 'Homestead filing service' does not include any service performed by an attorney at law authorized to practice in this state for a client who has retained that attorney or an employee of that attorney acting under the attorney's direction and supervision.

"(2) A 'homestead declaration' has the meaning described in Article 5 (commencing with Section 704.910) of Chapter 4 of Division 2 of Title 9 of Part 2 of the Code of Civil Procedure."

Morse did not attempt to screen prospective customers. Instead, DPC sent packages of materials to persons regardless of whether they were eligible to record a homestead declaration. Morse had no advance knowledge of the persons to whom DPC sent mailings.

Customers completed the "retainer/information forms" and returned them with checks to DPC. Employees of DPC prepared homestead declarations and forwarded the documents and checks to Morse's office. Typically, a nonattorney employee of Morse reviewed the documents to ensure that the property descriptions on the declarations matched the descriptions on the forms. Morse's office then sent the declarations to the customers with instructions for having the declarations notarized and recorded.

## II. *Civil action against Morse*

After unsuccessfully requesting that Morse stop mailing advertisements unlawful under section 17537.6, the California Attorney General and the Alameda County District Attorney filed an action against Morse in August 1991 for an injunction, civil penalties, restitution, and other relief. Morse argued that the restrictions of section 17537.6 did not apply to him and were unconstitutional. The superior court issued a preliminary injunction ordering Morse to cease violating section 17537.6. Morse appealed.

In November 1992, the superior court granted the plaintiffs' motion for summary adjudication and permanently enjoined Morse from violating section 17537.6 by mailing unlawful homestead-service advertisements to the public. The superior court further ordered Morse to pay $400,000 in civil penalties (one-half payable to the Attorney General and one-half payable to the Alameda County Treasurer) and also to pay $400,000 in *cy près* restitution to the Consumer Protection Prosecution Trust Fund. Morse also appealed from this judgment.

The Court of Appeal consolidated Morse's two appeals, affirmed the superior court's judgment, and dismissed the appeal from the order granting the preliminary injunction because the superior court's judgment had mooted that appeal. (*People* v. *Morse* (1993) 21 Cal.App.4th 259 [25 Cal.Rptr.2d 816].) Briefly stated, the Court of Appeal held that: (1) Section 17537.6 does not violate Morse's right to free speech under the First Amendment to the United States Constitution because Morse's advertisements were ". . . deceptive and misleading in a number of ways, and therefore are not entitled to First Amendment protection." (*People* v. *Morse, supra*, 21 Cal.App.4th at p. 266.) (2) Section 17537.6 is not unconstitutionally vague. (*People* v. *Morse, supra*, 21 Cal.App.4th at pp. 269-271.) (3) Section 17537.6 does not violate Morse's right to due process (U.S. Const., 14th Amend.) by creating an evidentiary presumption against him. (*People* v. *Morse, supra*, 21 Cal.App.4th at p. 271.) (4) The trial court's assessment of civil penalties and

order for restitution were proper. (*People* v. *Morse, supra,* 21 Cal.App.4th at pp. 271-275.)

Morse unsuccessfully petitioned this court for review of the Court of Appeal decision. (*People* v. *Morse, supra,* 21 Cal.App.4th 259, review den. Mar. 17, 1994 (S037673).) The United States Supreme Court denied his petition for a writ of certiorari. (*Morse* v. *California* (1994) __ U. S. __ [130 L.Ed.2d 36, 115 S.Ct. 83].)

While his consolidated appeals in the civil enforcement action were pending, Morse filed a purported taxpayer's action under Code of Civil Procedure section 526a, challenging the constitutionality of section 17537.6 and seeking to enjoin the California Attorney General and the Alameda County District Attorney from enforcing section 17537.6. The superior court denied Morse's request for a preliminary injunction, explaining that the court already had twice rejected his arguments in the enforcement action, and awarded $3,900 in sanctions against Morse. He appealed. In an unpublished decision, the Court of Appeal affirmed the order denying an injunction and imposing sanctions. The Court of Appeal also found Morse's appeal to be frivolous and imposed additional sanctions of $7,500.

On July 26, 1994, the parties in *People* v. *Morse* stipulated to a reduction of the judgment, approved by the Alameda County Superior Court, which declared that the judgment against Morse would be fully satisfied if Morse: (1) paid $170,000 in civil penalties (one-half payable to the Attorney General, one-half payable to the Alameda County treasurer); and (2) paid $170,000 in *cy près* restitution to the Consumer Protection Prosecution Trust Fund. The modification required that Morse pay $70,000 of the $340,000 modified judgment on September 1, 1994, with the balance of $270,000 due in monthly installments of $2,500, commencing October 1, 1994. The modification also specified that, if Morse fails to make any required payment within 120 days of its due date, the full amount of $800,000 in civil penalties and *cy près* restitution, plus interest and less payments made, shall be immediately due and payable. We take judicial notice of the parties' agreement. (Evid. Code, §§ 452, subd. (d), 459.)[2]

III. *State Bar proceeding*

While the civil enforcement action was pending, Morse also was subject to the present State Bar disciplinary proceeding. The Office of the Chief Trial Counsel filed in June 1991 a six-count notice to show cause, which charged Morse with violating section 6068, subdivision (a), which requires an attorney to support the law, and with violating rule 1-400(D) of the Rules

---

[2]Our original opinion did not cite the modified judgment filed in *People* v. *Morse* because that judgment was not included, or referenced, in the record of the disciplinary proceedings.

of Professional Conduct, which prohibits misleading advertisements.[3] Hearings were held in October and December 1992. The hearing judge filed a 48-page decision that recommended a 1-year stayed suspension and 3 years of probation, conditioned on 15 days of actual suspension and other requirements.

Morse sought review by the review department, and raised before it the same constitutional arguments he was then raising before the Court of Appeal in the civil enforcement action. At Morse's request, the review department abated the disciplinary proceeding until February 1994 to allow the Court of Appeal to decide the constitutional issues. The review department resumed its proceedings after the Court of Appeal rendered its decision in December 1993.

The review department independently reviewed the record to determine if clear and convincing evidence supported the findings of Morse's culpability and the aggravating and mitigating circumstances. Briefly summarized, the review department's findings and conclusions regarding the six counts of alleged misconduct are as follows:

*Counts 1 and 2*—Section 6068, subdivision (a) requires an attorney "[t]o support the Constitution and laws of the United States and of this state." Section 17537.6, subdivision (b) requires specified disclosures by a person offering to prepare a homestead declaration. Subdivision (c) of section 17537.6 requires the preparer promptly to file the declaration and to pay notarization and recordation fees; subdivision (d) limits the preparer's total fee to no more than $25. Morse failed to comply with these requirements. The review department stated that "[h]is original failure to do so was grossly negligent and could be characterized as reckless or intentional after he disregarded the later request from the Attorney General's Office that he stop mailing unlawful advertisements. Thus, his violations of section 17537.6 are disciplinable under section 6068(a)."

*Count 3*—Morse willfully violated rule 1-400(D)(2), which states that an advertisement shall not "[c]ontain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public." As the review department noted, in each envelope that Morse sent to a prospective customer, the inserted material was arranged so that "[t]he recipient could read only the name of the [recipient's] lender, the phrase 'PRIORITY ADVERTISMENT [*sic*]' underneath the lender's name, and then the recipient's own name and address. Because the arrangement of materials tended to mislead the recipient into

---

[3]Unless otherwise indicated, all further references to rules are to the Rules of Professional Conduct of the State Bar of California in effect from May 27, 1989, as they read before the amendments that took effect September 14, 1992.

believing that the letter came from the recipient's lender, respondent [Morse] wilfully violated rule 1-400(D)(2)."

*Count 4*—Rule 1-400(A) defines a "communication" to be ". . . any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client . . . ." Rule 1-400(D)(4) requires that a communication shall not "[f]ail to indicate clearly, expressly, or by context, that it is a communication or solicitation, as the case may be." According to the review department, Morse did not violate Rule 1-400(D)(4) because, "[t]he insert visible through the plastic window of the envelopes sent out by [Morse] expressly stated 'PRIORITY ADVERTISMENT [*sic*].' Also, the 'homestead information sheet' and the 'retainer/information form' showed that [Morse] was available for employment in preparing a homestead declaration."

*Count 5*—As noted above, rule 1-400(D)(2) proscribes misleading advertisements by an attorney. Rule 1-400(D)(3) also provides that an advertisement must state every fact ". . . necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public." Morse willfully violated these rules. The review department found that the "homestead information sheet" included in Morse's mass mailings ". . . failed to explain that California law establishes an automatic homestead exemption (see Code Civ. Proc., §§ 704.710-704.850), as well as allowing a homeowner to record a declared homestead (see Code Civ. Proc., §§ 704.910-704.995), and that the benefits of the automatic homestead exemption are available to a homeowner who does not record a declared homestead. By omitting this information, and by using the terms 'homestead exemption' and 'homestead declaration' as if they were interchangeable, [Morse's] materials tended misleadingly to suggest that a homestead exemption applied only if a homeowner recorded a homestead declaration. (See *People* v. *Morse, supra*, 21 Cal.App.4th at pp. 266-267.) Also, the materials tended to mislead recipients by failing to explain that a creditor may force the sale of a home even if a homeowner records a homestead declaration. (See *id.* at pp. 267-268.)"

*Count 6*—The review department explained that Morse also violated rules 1-400(D)(2) and 1-400(D)(3) in another respect: "The back side of the 'homestead information sheet' contained a section entitled 'SOME ADDITIONAL BENEFITS OF RECORDING A DECLARATION OF HOMESTEAD.' The third paragraph of this section stated: 'If a creditor tries to force a sale of your home, with a Declaration of Homestead you'll have an important advantage over him in court. The creditor has the burden of proof to show why you should not be allowed the Homestead Exemption. Otherwise, the court will take your Declaration at its face value and grant you the exemption.' " Morse willfully violated rules 1-400(D)(2) and 1-400(D)(3), insofar

as the paragraph stressed the benefits of a homestead declaration without providing any information about the automatic homestead exemption. The review department found that "[b]y omitting such information, [Morse] tended misleadingly to suggest that a debtor had to record a homestead declaration to obtain the homestead exemption. [Moreover,] . . . the paragraph misleadingly implied that a debtor who has not recorded a homestead declaration in the office of the county recorder bears the burden of proving that the dwelling is a homestead."

The review department also considered the aggravating and mitigating circumstances. Briefly stated, its findings and conclusions in that regard are as follows:

### Aggravating Circumstances

Standard 1.2(b)(ii) of the Rules of Procedure of the State Bar, division V, Standards for Attorney Sanctions for Professional Misconduct (standards), provides that multiple acts of wrongdoing or a pattern of misconduct constitutes an aggravating circumstance. The review department found this circumstance to apply because Morse ". . . sent out millions of unlawful advertisements which tended to mislead the public . . . and because [Morse] engaged in years of extended, methodical misconduct."

Pursuant to standard 1.2(b)(iii), bad faith surrounding an attorney's misconduct is an aggravating circumstance. The review department stated that "bad faith denotes conscious wrongdoing," and found that ". . . the record does not establish by clear and convincing evidence that [Morse's] misconduct was aggravated by surrounding bad faith." Standard 1.2(b)(iii) also states that other ethical violations surrounding an attorney's misconduct constitute an aggravating circumstance. The review department found that: "The notice to show cause charged [Morse] with misconduct only from January 1990 onwards. Yet the record establishes that from January 1988 through December 1989, respondent committed similar acts of misconduct in willful violation of section 6068(a), rule 1-400, and rule 2-101 of the former Rules of Professional Conduct in effect from January 1, 1975, to May 26, 1989. [Fn. omitted.] Pursuant to our obligation of independent review, we conclude that standard 1.2(b)(iii) applies in the current proceeding because of [Morse's] other ethical violations. (See *Edwards* v. *State Bar* (1990) 52 Cal.3d 28, 35-36 [276 Cal.Rptr. 153, 801 P.2d 396]; *In the Matter of Koehler* (Review Dept. 1991) 1 Cal.State Bar Ct. Rptr. 615, 628.)"

Standard 1.2(b)(v) states that ". . . demonstrated indifference toward rectification of or atonement for the consequences of his or her misconduct . . ." is an aggravating circumstance. The review department found Morse had shown such an attitude in several respects. He repeatedly denied any culpability even after his arguments were rejected by the trial court and

the Court of Appeal in the civil action and after tentative findings of culpability in the disciplinary proceeding. He showed further indifference by filing a complaint for relief in the superior court on grounds the superior court had already rejected. The review department stated that: "By repeatedly asserting rejected arguments without adequate research, [Morse] crossed the line between zealous advocacy and recalcitrance. Whether or not he had doubts about the applicability of section 17537.6, he clearly violated rule 1-400 by his broad-scale deceptive advertising. Thus, he lacked insight into his misconduct and failed to accept responsibility for it."

The review department also noted as a minor aggravating factor Morse's having committed himself to appear in an unrelated civil case, which commitment led to the continuance of the initially scheduled disciplinary hearing on short notice. Because Morse knew about the double scheduling for more than four months and did nothing to remedy the situation, the review department concluded this was yet another instance in which Morse showed indifference to his professional obligations.

*Mitigating Circumstances*

The review department concluded that respondent's lack of a disciplinary record is a mitigating circumstance under standard 1.2(e)(i), but is entitled to minimal weight because his misconduct began slightly more than six years after his admission to the bar. Under standard 1.2(e)(ii), good faith is a mitigating circumstance, but the review department found that Morse had failed to establish his good faith by clear and convincing evidence. The department rejected his claim that he had performed extensive pro bono legal work and also his argument that the State Bar refused to assist him in bringing his conduct into compliance with ethical rules, stating: "Nor is there any reason to believe that [Morse] would have conformed to any overtures by State Bar staff since [he] ignored advice from the Attorney General's office and continued sending out unlawful advertisements until the superior court issued a preliminary injunction."

*Recommended Discipline*

The review department adopted the State Bar hearing judge's discipline recommendations with two important exceptions. First, the department increased from 15 days to 60 days the period of actual suspension from the practice of law. Second, the department deleted as an explicit condition of probation the payment of $400,000 in *cy près* restitution. The department did so on the ground that the condition was redundant of the superior court judgment requiring him to pay that amount of restitution.

IV. *Morse's petition for review*

Morse petitioned for our review of the review department's decision. (Cal. Rules of Court, rule 952(a).) In large part, he reiterated the arguments he

raised in the superior court, the Court of Appeal, and the State Bar Court. We granted his petition and also stated in our order that: "On the court's own motion, review is granted on the issue [of] whether the level of discipline should be increased."

DISCUSSION

Morse raised six issues in his petition for review and argues them at some length in his briefing, including whether the discipline recommended by the State Bar is ". . . excessive in light of the record as a whole." As noted above, we also referred explicitly to the adequacy of the recommended discipline in our order granting review. That is the primary issue before us. We see no need to consider in detail the other issues raised by Morse. The significant facts are not disputed, and with minor exceptions, the issues have been fully considered by the Court of Appeal in the civil enforcement action. We agree with the Court of Appeal's decision on those issues. Morse's more serious arguments also have been carefully considered and rejected by the State Bar Court, both by a hearing judge and the review department. We agree with the review department's decision on those issues. To provide additional context for the disciplinary question, however, we shall nevertheless briefly set forth each of the issues raised by Morse before turning to the adequacy of the recommended discipline.

1. *Constitutionality of section 17537.6*

A. *First Amendment*

Morse contends section 17537.6's restrictions on, and requirements for, his mass mailings violate his right to free commercial speech under the First Amendment to the United States Constitution. Morse's argument has been rejected by the superior court, the Court of Appeal, the State Bar Court's hearing judge, and the review department. The reason should be obvious to Morse by now. His argument is meritless. The Court of Appeal correctly explained, "[F]or commercial speech to receive First Amendment protection, 'it at least must concern lawful activity and not be misleading.' . . . Whether the inherent character of a statement places it beyond the protection of the First Amendment is a question of law which we must determine after independently reviewing the record. . . . [¶] Having reviewed the record, we agree with respondent that Morse's advertisements are deceptive and misleading in a number of ways, and therefore are not entitled to First Amendment protection." (*People* v. *Morse, supra,* 21 Cal.App.4th 259, 265-266, citation omitted, fn. omitted.) The State Bar Court also found Morse's advertising to be misleading in many respects and thus unprotected by the First Amendment. We agree with the Court of Appeal and the State

Bar Court that Morse's advertisements were misleading. His First Amendment right to free speech was not violated by section 17537.6.[4]

B. *Alleged vagueness*

■ Morse contends section 17537.6 is vague regarding whether it applies to attorneys and that it thus violates his right to due process under the Fourteenth Amendment to the United States Constitution. Subdivision (e)(1) of section 17537.6, which defines a "homestead filing service," excludes "any service performed by an attorney at law authorized to practice in this state for a client who has retained that attorney or an employee of that attorney. . . ." Morse contends the statute does not define the word "retained," and thus does not adequately inform the reader whether the client has to be an existing client or one who had retained the attorney for other matters before discussing a homestead declaration, or whether the "retained" exemption applies only to an attorney being hired to prepare a homestead declaration. We disagree. Regardless of how the statute might be read in some other context, there is no ambiguity in the present case. No reasonable attorney could fairly read section 17537.6 to exempt mass mailings to millions of strangers. As the review department observed, "[N]one of the 4,000,000 persons to whom [Morse] sent advertisements were clients who had already retained him, and approximately 3,900,000 never completed the 'retainer' agreement or used his homestead services. He does not argue that these 3,900,000 persons had retained him. Moreover, he knew that he ordinarily provided no services characteristic of a retained attorney to the persons who responded to his advertisements. Typically, no attorney in his office dealt with these persons or prepared declarations for them."

We also agree with the Court of Appeal that the legislative history eliminated any asserted ambiguity in the statutory language. "In considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, we consider not only the language of the challenged statute, but also its legislative history. (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852].) 'We thus require citizens to apprise themselves not only of statutory language but also of legislative history . . . and underlying legislative purposes . . . .' (*Ibid.*) [¶] . . . Prior to its final passage, the bill that became section 17537.6 provided in relevant part: ' "Homestead filing service" does not include any service performed by an attorney at law authorized to practice in this state . . . .' (Assem.

---

[4]Morse also refers in passing to a right to free speech under the California Constitution (art. I, § 2, subd. (a)) but offers no discussion of that provision. We decline to address in any detail an issue raised so tangentially. In any event, though, we see no reason why Morse's misleading advertisements would be protected commercial speech under the California Constitution.

Amend. to Assem. Bill No. 684 (1987-1988 Reg. Sess.) May 4, 1987.) The Senate amended this provision of the bill to its final form by adding the phrase, 'for a client who has retained that attorney. . . .' (Sen. Amend. to Assem. Bill No. 684 (1987-1988 Reg. Sess.) Aug. 17, 1987.) According to the legislative history, the purpose of this amendment was to 'narrow the exemption for homestead filing services provided by attorneys or their employees to services provided to a client of the attorney's. Otherwise, the bill would have permitted attorneys or their agents to engage in the reprehensible mail order practices barred by this bill.' Thus, it is clear that the exclusion applies only to services an attorney provides to preexisting clients, and that the Legislature intended to prohibit attorneys from doing precisely what Morse did in this case. We therefore reject Morse's vagueness challenge." (*People* v. *Morse*, *supra*, 21 Cal.App.4th 259, 270-271, italics & fn. omitted.) We agree.

### 2. *Whether Morse's solicitations were misleading*

■ Morse remains steadfast in his view that his advertisements were not misleading. The Court of Appeal carefully reviewed the record and concluded to the contrary. (*People* v. *Morse*, *supra*, 21 Cal.App.4th 259, 266-269.) The review department did likewise. Both courts were correct. Revisiting this issue in detail would serve no purpose, and we decline to do so. We shall briefly note, however, the ways in which the advertisements were found to be misleading.

A. Morse failed to explain that, under Code of Civil Procedure sections 704.710-704.850, homeowners automatically receive a homestead exemption even if they do not record a homestead declaration. (*People* v. *Morse*, *supra*, 21 Cal.App.4th 259, 266.)

B. Morse's advertisements also were misleading in their discussion of a homeowner's protection against the forced sale of a home. The "homestead information sheet" suggests the recording of a homestead declaration necessarily prevents the forced sale of a home. The Court of Appeal correctly pointed out that, "[E]ven where a homeowner records a homestead declaration, a creditor may force the sale of a home through a levy pursuant to a writ of execution. (See Code Civ. Proc., §§ 704.740-704.800; 704.970.) Morse's statement is misleading in suggesting otherwise." (*People* v. *Morse*, *supra*, 21 Cal.App.4th 259, 267-268, fns. omitted.)[5] We also note that, even if Morse's statements regarding a forced sale were not misleading, they

---

[5]Under Code of Civil Procedure section 704.970, a creditor has the same right of levy pursuant to a writ of execution "whether or not a homestead declaration has been recorded." Subdivision (b) of that section directs that "[a]ny levy pursuant to a writ of execution . . . and the sale pursuant thereto shall be made in compliance with" the statutes governing the

would nevertheless be unlawful under section 17537.6, subdivision (a)(1), which makes unlawful a representation that "[t]he preparation or recordation of a homestead declaration will in any manner prevent the forced sale of a judgment debtor's dwelling."

C. The "homestead information sheet" was further misleading in suggesting that, absent a recorded homestead declaration, the homeowner bears the burden of proving the applicability of the exemption. We agree with the Court of Appeal that, "He is incorrect. Under Code of Civil Procedure section 704.780, subdivision (a)(1), even without a recorded homestead declaration, the creditor has the burden of proof '[i]f the records of the county tax assessor indicate that there is a current homeowner's exemption or disabled veteran's exemption for the dwelling claimed by the judgment debtor. . . .' This section 'creates a presumption in favor of exempt status if the judgment debtor has claimed a homeowner's or veteran's property tax exemption for the dwelling.' (Recommendation Relating to the Enforcement of Judgments Law (Sept. 1982) 16 Cal. Law Revision Com. Rep., *supra* [1982], at p. 1095.) Moreover, it places an affirmative burden *on the creditor*, in applying for an order of sale, to indicate 'whether or not the records of the county tax assessor indicate that there is a current homeowner's exemption or disabled veteran's exemption for the dwelling and the person or persons who claimed any such exemption.' (Code Civ. Proc., § 704.760, subd. (a).) Thus, Morse's materials are deceptive in suggesting that, in order not to have the burden of proving the applicability of the homestead exemption, a homeowner must record a homestead declaration." (*People* v. *Morse, supra*, 21 Cal.App.4th 259, 268-269, fn. omitted.)

D. Rule 1-400(D)(2) states that an advertisement shall not "Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public." The review department found that, "Because the arrangement of [Morse's] materials tended to mislead the recipient into believing that the letter came from the recipient's lender, [Morse] wilfully violated rule 1-400(D)(2)."

In short, we agree with the Court of Appeal and the review department that Morse's advertisements were misleading in multiple respects.

---

automatic homestead exemption (Code Civ. Proc., §§ 704.710-704.850), "and the judgment debtor and the judgment creditor shall have all the rights and benefits provided by" those statutes. Under Code of Civil Procedure section 704.800, subdivisions (a) and (b), even if the automatic homestead exemption applies, a creditor may force the sale of a homestead if, at a court-ordered sale, there is a bid that (1) "exceeds the amount of the homestead exemption plus any additional amount necessary to satisfy all liens and encumbrances on the property, including but not limited to any attachment or judgment lien," and (2) "is 90 percent or more of the fair market value . . . ."

### 3. *Whether section 17537.6 misstates the law*

As noted above, section 17537.6, subdivision (a)(1) makes unlawful a representation that "[t]he preparation or recordation of a homestead declaration will in any manner prevent the forced sale of a judgment debtor's dwelling." Section 17537.6, subdivision (b)(1) goes even further, requiring an affirmative disclosure that "RECORDING A HOMESTEAD DECLARATION DOES NOT PROTECT YOUR HOME AGAINST FORCED SALE BY A CREDITOR." (Original capitalization.) Morse contends these provisions of section 17537.6 mandate the giving of false legal advice. (He also suggests the section is unconstitutional because it proscribes truthful speech, i.e., that a recorded declaration may prevent a forced sale.) By rejecting his argument that his advertisements were not misleading regarding forced sales, the Court of Appeal necessarily, albeit implicitly, also rejected Morse's premise that section 17537.6, subdivision (a)(1) is incorrect regarding forced sales. (See pp. 201-202, *ante*.)

█ In this court, Morse reiterates his view that section 17537.6 requires false advice because, in his view, a recorded homestead declaration can prevent the forced sale of a judgment debtor's home. He relies primarily on *Webb* v. *Trippet* (1991) 235 Cal.App.3d 647 [286 Cal.Rptr. 742] (*Webb*), a decision that he apparently did not bring to the attention of the Court of Appeal in the civil enforcement action. In *Webb*, the court reversed an order directing the sale of a judgment debtor's real property. The real property owner had recorded a homestead declaration. A creditor thereafter obtained a monetary judgment against the owner. The owner disappeared and did not reestablish residence on the property. (A conservator was appointed for the owner's estate.) The issue was whether the owner was entitled to a homestead exemption, even though he no longer resided on the property. The conservator contended there is no express requirement of actual residence when a homestead declaration has been filed. The trial court implicitly determined that continuous residence is necessary to invoke either the automatic homestead exemption or the declared homestead exemption. The Court of Appeal disagreed. It explained that an automatic exemption applies when a party has continuously resided in a dwelling from the time that a creditor's lien attaches until a court's determination that the exemption applies. Put simply, residence was found to be a requirement for the exemption. The court explained, however, that a recorded homestead declaration ". . . is entitled to a presumption of validity and may be abandoned only by specific statutorily prescribed methods." (*Id.* at p. 652.) Because the judgment creditor had not shown that the owner had abandoned the homestead, for example, by establishing another residence as the owner's principal dwelling, the creditor was not entitled to a forced sale of the home.

Morse's reliance on *Webb, supra,* 235 Cal.App.3d 647, is too broad. The narrow and dispositive question was whether the debtor was entitled to the

declared homestead exemption in light of his disappearance, that is, whether the creditor had proved the debtor's abandonment of the homestead. (*Id.* at pp. 651-652.) In a practical sense, Morse is correct that the declaration in *Webb* prevented a forced sale, at least for a while. He ignores, though, the context. The court made clear that, if abandonment were proved, "the exemption should be lifted and the property may then be ordered for sale." (*Id.* at p. 652.) For our present purpose, all that *Webb* shows is that a declared homestead may, depending on the circumstances, offer an advantage over the automatic homestead exemption. For example, in *Webb* the property owner lost the automatic exemption because he had ceased to reside on the property, whereas his declared homestead continued in effect until a statutorily prescribed form of abandonment was shown.

Morse is simply incorrect in his steadfast assertion that a homestead declaration prevents a forced sale. Code of Civil Procedure section 704.970 states in simple and easily understood language: "Whether or not a homestead declaration has been recorded: [¶] (a) Nothing in this article affects the right of levy pursuant to a writ of execution." (See also 5 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 13:35, p. 277.) Section 17537.6 does not, as Morse asserts, misstate the law. To the contrary, it is the law.

### 4. *Legislative intent behind section 17537.6*

■ Morse contends: "The idea of giving free information out to individuals with the option of performing a service for a small fee is not exploitive, misleading or fraudulent in any way. The Homestead Information Sheet [that he mailed] may have, in some cases, cleared up some confusion about the Homestead Exemption laws. . . . Petitioner [Morse] never received a complaint from anyone about the service he provided. Therefore, Petitioner has not participated in false advertising and the legislative intent [for section 17537.6] does not encompass the type of mailing sent out by Petitioner." This argument barely warrants a response. As explained above, the Court of Appeal and the review department found that Morse's advertisements were misleading in multiple respects. (Pp. 201-202, *ante.*) We agree. Moreover, Morse's assertion that he was performing a free service is specious. He was clearly engaged in his homestead business for profit. Advertising is, by its nature, generally free to the recipient, at least in the sense that he or she does not directly pay to receive the advertisement. (The recipient pays for the product or service, not for the advertising itself.) Under Morse's convoluted view, there is no such thing as deceptive advertising because advertising is free to the recipient. We are not persuaded. As the Court of Appeal aptly observed, "[t]he Legislature intended to prohibit attorneys from doing precisely what Morse did in this case." (*People* v. *Morse, supra,* 21 Cal.App.4th 259, 271.)

### 5. Adequacy of the recommended discipline

 We come now to the heart of this case. The State Bar Court's hearing judge recommended a 15-day actual suspension. Morse objected to that as excessive and requested the review department to consider the issue. The review department increased the recommended actual suspension to a period of 60 days. Morse then sought our review, claiming the period of actual suspension is excessive. Our order granting review placed him on notice that we would consider ". . . whether the level of discipline should be increased." As we shall explain, we conclude the 60-day actual suspension recommended by the review department is not sufficient. We increase the actual suspension to three years, subject to a possible reduction to two years, which reduction is contingent on Morse's timely and full payment of the superior court judgment against him for penalties and restitution.

We begin by looking to the purpose of sanctions for attorney misconduct. "The primary purposes of disciplinary proceedings conducted by the State Bar of California and of sanctions imposed . . . are the protection of the public, the courts and the legal profession; the maintenance of high professional standards by attorneys and the preservation of public confidence in the legal profession." (Std. 1.3; see also *Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106].)

 We next consider our role in reviewing recommended discipline. To be sure, "[w]e generally accord great weight to the review department's recommendation." (*Bercovich* v. *State Bar* (1990) 50 Cal.3d 116, 131 [266 Cal.Rptr. 341, 785 P.2d 889]; *In re Lamb* (1989) 49 Cal.3d 239, 245 [260 Cal.Rptr. 856, 776 P.2d 765]; *Garlow* v. *State Bar, supra,* 30 Cal.3d 912, 917.) Nevertheless, ". . . the ultimate decision rests with this court, and we have not hesitated to impose a harsher sanction than recommended by the department. (*In re Mostman* (1989) 47 Cal.3d 725, 740 [254 Cal.Rptr. 286, 765 P.2d 448] [actual suspension increased from eighteen months to two years]; *Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1100-1101 [245 Cal.Rptr. 628, 751 P.2d 894] [one-year probation with no actual suspension increased to two years' probation with six months' actual suspension]; *Martin* v. *State Bar* (1978) 20 Cal.3d 717, 723 [144 Cal.Rptr. 214, 575 P.2d 757], [six months' actual suspension increased to one year].) *When the facts have warranted doing so, we have even rejected a recommendation of suspension and disbarred the attorney. (In re Nevill* [1985], 39 Cal.3d 729, 735 [217 Cal.Rptr. 841, 704 P.2d 1332].)" (*Blair* v. *State Bar* (1989) 49 Cal.3d 762, 776 [263 Cal.Rptr. 641, 781 P.2d 933], italics added [actual suspension increased from 18 months to 2 years]; accord *Garlow* v. *State Bar, supra,* 30 Cal.3d 912, 916 ["The ultimate decision, of course, remains with us."].) As we shall explain, this is an appropriate case for increasing the recommended discipline. (See, e.g., *Blair* v. *State Bar, supra,* 49 Cal.3d 762, 776.)

"In deciding appropriate discipline, we consider the underlying misconduct and aggravating and mitigating circumstances, if any." (*Blair* v. *State Bar, supra,* 49 Cal.3d 762, 776.) As the review department correctly observed in the present case, "In a disciplinary proceeding, the deputy trial counsel must prove culpability and aggravating circumstances by clear and convincing evidence. (See *In the Matter of Respondent H* (Review Dept. 1992) 2 Cal.State Bar Ct. Rptr. 234, 239, and cases cited therein; Trans. Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct ('stds.'), std. 1.2(b).) The attorney accused of misconduct must prove mitigating circumstances by clear and convincing evidence. (Std. 1.2(e).)"

■ As set forth above (pp. 201-202, *ante*), Morse's misconduct is well established by the required clear and convincing evidence, and we fully agree with the review department's findings of misconduct. We also agree with the department's findings regarding aggravating and mitigating circumstances. (Pp. 197-198, *ante*.)

■ To determine the appropriate level of discipline after these facts are established, we, like the review department, must look first to the standards for guidance. "These guidelines are not binding on us, but they promote the consistent and uniform application of disciplinary measures. Hence, we have said that 'we will not reject a recommendation arising from application of the Standards unless we have grave doubts as to the propriety of the recommended discipline. . . .' " (*In re Lamb, supra,* 49 Cal.3d 239, 245, quoting *Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1366 [240 Cal.Rptr. 848, 743 P.2d 908].) ■ As the review department explained, the standards, however, provide little guidance in this case. Standard 2.6 provides that Morse's violation of section 6068 ". . . shall result in disbarment or suspension depending on the gravity of the offense or the harm, if any, to the victim[s], with due regard to the purposes of imposing discipline set forth in standard 1.3." Morse was also found by the review department to have violated rules 1-400(D)(2) and 1-400(D)(3). Those violations are subject to standard 2.10, which applies to a ". . . wilful violation of any Rule of Professional Conduct not specified in these standards . . . ." Standard 2.10, like standard 2.6, provides for a wide range of discipline: ". . . reproval or suspension according to the gravity of the offense or the harm, if any, to the victim[s], with due regard to the purposes of imposing discipline set forth in standard 1.3." In light of the lack of specificity in the applicable standards, we must use as our lodestar the purposes of discipline, as set forth above. (P. 205, *ante*.)

We respectfully reject as inadequate the review department's recommendation for an actual suspension of only 60 days. Indeed, so short an actual

suspension seems contrary to the department's own recognition of ". . . significant aggravating circumstances [even beyond those found by the hearing judge] . . . , gross negligence, the extended and methodical nature of [Morse's] misleading advertisements, the absence of any significant mitigation, and the need to maintain high professional standards and to preserve public confidence in the legal profession . . . ." We agree with that view of this case. We believe, however, that such circumstances warrant more severe discipline in the form of a period of actual suspension for three years, subject to a possible reduction to two years.

Before proceeding further to discuss Morse's particular circumstances, we note an additional shortcoming in the review department's approach. The department stated that: "We do not consider more serious discipline than 60 days actual suspension in part because the deputy trial counsel has not urged us to recommend that [Morse] be actually suspended for a period longer than 15 days." ■ The review department should not have relied so heavily on trial counsel's recommendation. As the department noted earlier in its own opinion, the department ". . . must independently review the record and may adopt findings, conclusions, and a decision or recommendation at variance with the hearing decision."

■ Returning to the merits of the present case, we note that, because the applicable standards allow such a wide range of discipline, the review department properly looked to decisional law for guidance. The review department explained: "The discipline for improper *personal* solicitation of clients has ranged from six months actual suspension for isolated acts of solicitation to disbarment in extreme cases. . . . The current proceeding, however, involved the mailing of advertisements which raise different issues from personal solicitation since they are less intrusive." The department looked to three, more apposite, advertising cases. We shall consider them as well, although only briefly, because the scope of Morse's advertising was so broad as to render this a sui generis case. Moreover, the aggravating and mitigating circumstances varied from case to case.

In *Gadda* v. *State Bar* (1990) 50 Cal.3d 344 [267 Cal.Rptr. 114, 787 P.2d 95], among other acts of misconduct, the attorney mailed between 500 and 800 letters advertising his ability to provide legal advice about a new federal immigration law. He based his letter on a newspaper headline and did not verify whether Congress had passed the law. In fact, the law did not pass until some three months after the letter was mailed. (The other misconduct included neglect of client matters, instructing a client to lie to a government official, and failure to supervise properly an associate.) In aggravation, the attorney was reluctant to recognize the seriousness of his misconduct and to

accept responsibility for his wrongdoing. In mitigation, he had demonstrated zeal in undertaking pro bono work. The discipline was two years' stayed suspension and three years' probation, conditioned on actual suspension for six months and until the attorney made restitution. Although the discipline rested mainly on the attorney's other misconduct, we observed that his false advertisements were likely to undermine public confidence in the legal profession. (*Id.* at p. 355.)

In *Leoni* v. *State Bar* (1985) 39 Cal.3d 609 [217 Cal.Rptr. 423, 704 P.2d 183], two attorneys who each had practiced law for more than 30 years mailed letters and informational pamphlets about debt problems to the public. From November 1978 to July 1980, they sent 83 versions of letters and pamphlets to approximately 250,000 persons. The recipients were defendants in small claims or municipal court actions or were owners of real properties in foreclosure. We concluded that the attorneys had violated former rule 2-101(A)(3), which prohibited the omission of facts necessary to make the advertisements not misleading; former rule 2-101(A)(4), which prohibited the failure to identify the advertisements clearly as communications for employment; and former rule 2-101(A)(6), which prohibited the sending of the advertisements in a format involving intrusion, threats, intimidation, harassment, or duress. Because the attorneys had no prior disciplinary records and had made good faith efforts to make the letters not misleading, we determined that a public reprimand was appropriate.

In *In the Matter of Mitchell* (Review Dept. 1991), 1 Cal.State Bar Ct. Rptr. 332, the attorney committed acts of dishonesty in violation of section 6106 by knowingly misrepresenting his education on a resumé sent to various law firms and by failing to correct the misrepresentation during an interview with a law firm. In aggravation, the attorney sent out false resumés for approximately three years and gave deceitful answers to interrogatories from the State Bar. The discipline was a one-year stayed suspension and one year probation, conditioned on sixty days' actual suspension.

The review department in the present case concluded that Morse's misconduct was less serious than the attorney's in *Gadda* v. *State Bar*, *supra*, 50 Cal.3d 344, but was more serious than the attorney's misconduct in *Leoni* v. *State Bar*, *supra*, 39 Cal.3d 609, because Morse mailed approximately 4 million (rather than 250,000) misleading advertisements for more than 4½ (rather than 1½) years. *In the Matter of Mitchell*, *supra*, 1 Cal.State Bar Ct. Rptr. 332, was least apposite because of its particular aggravating and mitigating factors.

These decisions provide some guidance, but our determination of the appropriate discipline ultimately depends on the answers to two key questions. First, what did Morse do wrong? Second, what is the discipline most

likely to protect the public, the courts, and the profession, or stated conversely, to deter Morse from future wrongdoing?

We begin with the wrongdoing. As explained above (pp. 195-197, *ante*), the review department found a protracted pattern of serious misconduct with significant aggravating circumstances and no significant mitigating circumstances. Those facts tell a troubling tale. Morse sent approximately four million misleading advertisements to California homeowners seeking their money. In addition to being misleading, the solicitations did not comply with the simple requirements of section 17537.6. Morse made a net profit of $150,000 to $200,000.

He was requested by the Attorney General and a district attorney to stop misleading the public. He refused, forcing the authorities to obtain an injunction. (This itself required an expenditure of public funds.) He was ordered to pay a total of $800,000 in penalties and restitution. He appealed. He lost. He sought our review. He did not get it. He went to the United States Supreme Court. He was turned away. He also sued those seeking to protect the public. He lost that case as well. He appealed again. He lost again. He was ordered to pay several thousands of dollars in sanctions. Even now, he continues to assert that he should not be disciplined. Of course, Morse, like any attorney accused of misconduct, had the right to defend himself vigorously. Morse's conduct, however, reflects a seeming unwillingness even to consider the appropriateness of his statutory interpretation or to acknowledge that at some point his position was meritless or even wrong to any extent. Put simply, Morse went beyond tenacity to truculence.

Morse also appears unwilling to accept any meaningful discipline. The hearing judge recommended only a 15-day actual suspension, an exceedingly light sanction. Rather than count his good fortune, Morse felt wronged, arguing to the review department that the suspension was excessive. When the review department increased the actual suspension to 60 days, still a minor sanction, Morse sought our review.

It is also important to appreciate the significance of the superior court's order of restitution. The restitution requirement reflects that Morse wrongly benefited from his actions. We can reasonably assume that at least some, if not most, of those who responded to his misleading solicitations were those who are unsophisticated in the law and perhaps least able to afford his purported service. Such an individual's fee, although perhaps paltry to Morse, was money the homeowner could have spent on other, more important items such as food, shelter, and clothing. Morse's misconduct reflects a callous disregard for those most in need of protection by the profession and the courts.

We turn now to the second question: what is the discipline most likely to protect the public, the courts, and the profession, or, stated conversely, to deter Morse from future wrongdoing? We conclude that an actual suspension of three years, with a possible reduction to two years, is required. Such a period should demonstrate to Morse that we take seriously his misconduct. This period of forced respite from practice may also allow him time for introspection so that he will come to appreciate that law is more than a mere business. It is still a profession in which concerns for ethics matter. We have observed that an errant attorney's ". . . assertion that *no* discipline should be imposed shows that he does not recognize his problems and that he may not correct them." (*Blair* v. *State Bar*, *supra*, 49 Cal.3d 762, 781-782.)

We choose the three-year period for an important practical reason as well. Under standard 1.4(c)(ii), ". . . actual suspensions imposed for a two (2) year or greater period shall require proof satisfactory to the State Bar Court of the member's rehabilitation, present fitness to practice and present learning and ability in the general law before the member shall be relieved of the actual suspension." Any period shorter than a two-year actual suspension requires no such showing of rehabilitation and fitness. In light of Morse's misconduct and recalcitrance, we believe such a showing is required to protect the public.

We also disagree with the review department's recommendation in one other respect. The State Bar hearing judge recommended as an explicit condition of probation that Morse pay $400,000 in restitution. The review department noted that the superior court in the civil enforcement action already had imposed that sanction. The department thus rejected the recommendation to impose restitution as an explicit condition of probation. The department reasoned that, as a condition of his probation, Morse must comply with the State Bar Act, including section 6103, which requires obedience to court orders. The department concluded that an explicit payment condition would thus be redundant of the superior court judgment requiring restitution.

Perhaps, as a technical matter, the review department was correct on this point. We nevertheless choose for two reasons to impose as an explicit condition of probation that Morse comply with the civil judgment, in particular that he pay the civil penalties and *cy près* restitution pursuant to the terms set forth in the "Stipulation and Modified Judgment," filed on July 26, 1994. First, our doing so will eliminate any possible future argument by Morse, if the situation should arise, that the probation condition has not been violated unless there is a further court order finding such violation. The

making of the payments an explicit condition of probation will allow the State Bar to take whatever action may be appropriate, independent of further civil court action. Second, we make payment of the restitution and penalities an explicit condition so that, as explained in greater detail in our dispositional statement below, if Morse timely makes full payment of those amounts, the period of actual suspension shall be reduced to two years.

Finally, we note that, in response to our order indicating we would consider increasing the recommended discipline, Morse briefly raises a hodgepodge of reasons why we should not increase the discipline. We reject all his arguments. In particular, he reiterates his challenges to section 17537.6 and claims he had ". . . an honest belief in his innocence and possibly a negligent good faith mistake in law." As explained above, the facts belie this claim. He also points to the "failure" of the Attorney General and the State Bar to assist him in making his solicitations compliant with the law. That is not their proper function. Moreover, the record shows that Morse tenaciously rebuffed every effort by the State Bar and the Attorney General to halt his improper solicitations. He points to the absence of complaints from recipients of his solicitations and the presence of some truthful information in them. The absence of complaints does not show the solicitations were proper; nor does the presence of some truthful information eliminate the misleading information. Morse also contends that: (1) our increasing the discipline (as did the review department) would unconstitutionally deter him from asserting his rights in this State Bar proceeding; (2) it was unfair to place on him the burden of obtaining the legislative history of section 17537.6 to determine if it supported his claim of statutory vagueness; and (3) increasing the recommended discipline would unlawfully place Morse in double jeopardy. None of these assertions has the barest merit.

## DISPOSITION

Petitioner Ivan O. B. Morse is suspended from the practice of law in the State of California for five years from the date this decision is final. Execution of the order of suspension is stayed, and Morse is placed on probation for a period of five years, subject to the following conditions:

1. Morse is placed on actual suspension from the practice of law in California during the first three years of probation.

2. Morse shall pay the $170,000 of *cy près* restitution and the $170, 000 of civil penalties pursuant to the terms ordered by the superior court on July 26, 1994, in the civil enforcement action against him, i.e., People v. Morse (Super. Ct. Alameda County, 1991, No. H-156662-0). Morse shall provide

satisfactory written proof of payments made pursuant to the July 26, 1994, order to his probation monitor within the first 90 days of the probation period. If Morse contends he is unable to pay this amount as required, Morse must submit to his probation monitor within the first 90 days of the probation period a written plan for prompt payment of as much of the amount as Morse is able to pay. The submission of any such plan by Morse must include satisfactory proof of Morse's financial condition and the amount he is able to pay. The State Bar Court is authorized to review de novo any decision by the monitor either to approve or to reject any payment plan proposed by Morse. If, within two years, Morse pays in full the $170,000 of *cy près* restitution and $170,000 of penalties, he shall be entitled to have the State Bar Court reduce the period of actual suspension from three years to two years.

3. During the period of probation, Morse shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California.

4. Morse shall be supervised by a probation monitor assigned by the Probation Unit, Office of Trials. Morse shall promptly review the terms and conditions of his probation with the monitor to establish a manner and schedule of compliance consistent with the terms of Morse's probation. During the probation, Morse shall timely furnish such reports as may be requested by his monitor. Morse shall cooperate fully with his monitor to enable the monitor to discharge his or her duties pursuant to rule 611 of the Rules of Procedure of the State Bar. During the periord of probation, Morse shall report not later than January 10, April 10, July 10, and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Probation Unit, Office of Trials, Los Angeles, which report shall state that it covers the preceding calendar quarter or applicable portion thereof, certifying by affidavit or under penalty of perjury (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, he shall file said report on the due date next following the due date after said effective date):

(a) in his first report, whether he has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation;

(b) in each subsequent report, whether he has complied with all provisions of the State Bar Act and Rules of Professional Conduct; and

(c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph certifying to the matters set forth in subparagraph (b) thereof.

5. Subject to the valid assertion of applicable testimonial privileges, Morse shall answer fully, promptly, and truthfully any inquiries of the Probation Unit, Office of Trials and any probation monitor assigned under these conditions of probation, which inquiries are directed to Morse either orally or in writing and which relate to whether Morse is complying with the terms of his probation.

6. Morse shall promptly report, and in no event less than 10 days after this court's decision becomes final, to the membership records office of the State Bar and to the State Bar's Probation Department, any change of Morse's address or telephone number as required by Business and Professions Code section 6002.1.

7. Before being allowed to resume the practice of law after the period of actual suspension, Morse shall comply with standard 1.4(c)(ii). The showing required under that standard shall include but not be limited to: (A) proof that Morse has taken and passed the California Professional Responsibility Examination administered by the bar examiners of the State Bar of California within one year before being allowed to resume practice, and (B) proof that during the period of actual suspension, Morse has personally attended not less than 12 hours of courses that are California mandatory continuing legal education (MCLE) approved in general legal ethics. Morse's attendance for credit at such classes shall be approved in advance by his probation monitor. The California State Bar's "Ethics School" shall be considered a satisfactory course for six hours of this MCLE requirement. The making of the showing required under standard 1.4(c)(ii) shall not shorten the period of actual suspension.

It is further ordered that Morse shall comply with rule 955 of the California Rules of Court, including subdivision (a), within 30 days of the effective date of this court's decision, and Morse shall file the affidavit required by rule 955(c) within 40 days of the effective date of this decision. (Bus. & Prof. Code, § 6126, subd. (c).)

The period of probation shall begin on the date this order becomes effective. Morse to pay costs as required by Business and Professions Code section 6086.10.

This order is effective on finality of decision in this court. (See Cal. Rules of Court, rule 24(a).)

**KENNARD, J., Concurring.**—As the majority explains, Attorney Ivan O. B. Morse sent out solicitations to homeowners offering to prepare homestead

declarations for them. I agree with the majority that these solicitations were misleading and made Morse subject to discipline. I write separately to express my concern with certain language in the majority opinion that may be misconstrued in future cases.

As Justice Mosk notes in his dissenting opinion, "the majority opinion [(see maj. opn., *ante*, at p. 209)] contains more than a subtle suggestion that Morse is being severely punished for exercising [his] right [to litigate the meaning and validity of Business and Professions Code section 17537.6 (the statute he was found to have violated)]—and for having the temerity to seek review of his State Bar case in this court . . . ." (Dis. opn., *post*, at p. 215].) I agree with Justice Mosk that an attorney's nonfrivolous exercise of the right to litigate an appeal is not a proper basis for punishment in State Bar proceedings.

Unlike Justice Mosk, however, who would have imposed more lenient terms of suspension and probation than the majority, I join the majority's disposition because it is within the appropriate range of discipline for Morse's conduct.

**MOSK, J.,** Dissenting.—I dissent from the majority's disposition increasing Morse's actual suspension to three years. I agree with the Review Department of the State Bar Court (review department) that Morse's misconduct merits no more than a 60-day actual suspension.

Although Morse's mass mailings were misleading and cannot be condoned, he committed no felony, he acted openly and not surreptitiously, he did not seriously mishandle any client's affairs, and, as the review department concluded, he did not act in bad faith. As a result of lengthy litigation through the court system he has already been subject to substantial civil penalties. A three-year probation and sixty-day actual suspension will be sufficient to make abundantly clear to Morse, and to the rest of the bar, that his interpretation of Business and Professions Code section 17537.6[1] was erroneous, and that his mass mailings based on this faulty interpretation violated ethical obligations of an attorney.

The record reveals that Morse mistakenly believed that section 17537.6 categorically exempted attorneys from its strictures. On its face, the statute arguably appears to do so. Section 17537.6 regulates "homestead filing service[s]," but subdivision (e)(1) of that section provides that the definition of a "homestead filing service" "does not include any service performed by an attorney at law authorized to practice in this state for a client who has

---

[1] All further statutory references are to this code.

retained that attorney or an employee of that attorney acting under the attorney's direction and supervision." The statute may be colorably construed to exempt an attorney such as Morse, who solicits and retains clients through mass mailings. Only when the statute is construed in light of its legislative history is his contention that the statute does not apply to him definitively refuted. (See *People* v. *Morse* (1993) 21 Cal.App.4th 259, 270-271 [25 Cal.Rptr.2d 816].) He certainly had a right to litigate the meaning and validity of the statute. But the majority opinion contains more than a subtle suggestion that Morse is being severely punished for exercising that right—and for having the temerity to seek review of his State Bar case in this court—rather than for any grievous wrongdoing.

The majority's prescribed punishment also deviates from prior case law. As illustrated by the two most apposite cases (*Gadda* v. *State Bar* (1990) 50 Cal.3d 344 [267 Cal.Rptr. 114, 787 P.2d 95] (*Gadda*); *Leoni* v. *State Bar* (1985) 39 Cal.3d 609 [217 Cal.Rptr. 423, 704 P.2d 183] (*Leoni*)), mass solicitations, even those that are misleading, have not generally warranted harsh discipline. In *Gadda*, the attorney mailed between 500 and 800 letters to past and present clients, advertising his ability to advise them on a new immigration law, although that law had not yet passed. He also seriously mishandled the affairs of two of his immigration clients, forcing one of them to go into hiding in order to avoid a deportation order that was the result of the attorney's gross negligence. In mitigation, he demonstrated a commitment to pro bono work. We upheld a two-year stayed suspension, a three-year probation, and a six-month actual suspension for the attorney's misconduct (*Gadda, supra*, 50 Cal.3d at pp. 356-357), which, taken in its totality, is arguably more serious than that of Morse.

In *Leoni*, two attorneys mailed approximately 250,000 letters to defendants in small claims and municipal court actions, or to owners of real property in foreclosure. The letters were found to be misleading and to have violated several of the Rules of Professional Conduct. The attorneys, who had each practiced law for over 30 years with no prior disciplinary record, and who made a good faith effort to make the letters truthful, were given merely a reprimand. (*Leoni, supra*, 39 Cal.3d at p. 628.)

Following the recommendation of the review department, I would subject Morse to a one-year stayed suspension, a three-year probation, and a sixty-day actual suspension. These penalties, as well as the defeat of Morse's legal claims, the $340,000 in civil penalties and restitution assessed against him, and the conditions of supervision during his probation, will clearly be enough to send the message to this petitioner and others that such solicitation

schemes will not be tolerated, thereby protecting the public. But I cannot share the majority's enthusiasm for a draconian penalty that will banish him from the legal profession for a period that is barely short of permanent.

Petitioner's application for a rehearing was denied November 16, 1995, and the opinion was modified to read as printed above. Werdegar, J., did not participate therein.

APPENDIX A

# HOMESTEAD INFORMATION SHEET

WHAT IS THE PURPOSE OF HOMESTEAD EXEMPTION? - The policy underlying all homestead laws is to provide a place for the family where they may reside and enjoy the comforts of a home, free from the anxiety that it may be taken away from them.

WHO MAY RECORD A DECLARATION OF HOMESTEAD? - Every homeowner may record a Homestead. In fact, unrelated persons can record separate Homesteads on the same property if each person owns a portion of it. A Homestead will remain in effect until the house is sold or until you decide to abandon it by recording another document. You are only entitled to one Homestead at a time.

WHO IS ELIGIBLE FOR THE HOMESTEAD EXEMPTION? - Every homeowner who resides in his/her home is entitled to this protection. The basic requirement is that the dwelling be your principal place of residence. Thus, rental properties or a second home do not qualify. However, if you own an apartment building where you reside in one unit, Homestead Exemption will apply to the entire building.

WHAT KIND OF PROPERTY IS COVERED? - Your principal place of residence may be protected by a Declaration of Homestead. This may include, but is not limited to, the following: a house, a condominium, a duplex, a community apartment project, a planned development, a mobile home, a boat, other water-borne vessels, or a stock cooperative.

## DECLARED HOMESTEAD
## INFORMATION AND BENEFITS

In today's society, it is possible to become involved in a lawsuit at one time or another. Hopefully, you will not. Many times a lawsuit is caused by circumstances beyond our control.

When you owe someone money, they are considered your creditor. If a creditor sues you in court and wins, they can record a lien against your home. This is often called judgment lien.

(1) JUDGMENT LIENS: When a Declaration of Homestead has been properly prepared and recorded, it prevents most judjgment liens from attaching to your home if the declaration was recorded prior to a creditor recording his judgment. Simply stated, the recording of a Declaration of Homestead can keep certain judgment liens "off your home".

NOTE: This benefit becomes very important when you want to sell your home. Title companies usually will not establish a clear title unless and until all liens are paid. By recording a Declaration of Homestead, you can sell your home and put the exempt proceeds ($30,000 to $75,000) in a new home within six months without having to use that money to pay for existing judgments that were protected by virtue of the declared homestead. This ONE TIME recording will last as long as you own (or are buying) and live in the home.

(2) WHAT ARE THE AMOUNTS OF PROTECTION?

EQUITY PROTECTED FROM LIEN ATTACHEMENT IN AMOUNTS UP TO:

HUSBAND AND WIFE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $45,000
HUSBAND AND WIFE (when one or both is 65 or older or *disabled) . . . . . . . 75,000
HEAD OR MEMBER OR **FAMILY UNIT . . . . . . . . . . . . . . . . . . . . . . . . 45,000
HEAD OR MEMBER OF FAMILY UNIT (when declarant is 65 or old or disabled) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75,000

SINGLE PERSON (65 or older or disabled) . . . . . . . . . . . . . . . . . . . . . . . . 75,000

SINGLE PERSON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,000

NOTE: $30,000.00 available to each person owning an interest in the home, e.g., unnamed co-owner living in the home.

\* Disabled individuals can include those receiving Social Security Disability or SSI benefits and others who are incapable of substantial gainful employment.

\*\* This can be an individual who has a dependent close relative under his or her care and maintenance who resides on the premises.

DO THE PROTECTION LIMITS EVER INCREASE? - Yes. The California State legislature periodically raises the declared homestead protection amounts as shown above. You automatically receive any increases that are made without having to record any additional documents.

(3) SELLING THE HOME: AFTER you voluntarily sell your home, if you invest the exempt proceeds in another home with six months, the previously exempted amount of equity WILL REMAIN PROTECTED WHILE MOVING TO A NEW RESIDENCE. By recording a Declaration of Homestead on the new home within six months, your protection continues from the date of the original homestead recording. In other words, YOUR PROTECTION IS CONTINUOUS AND UNINTERRUPTED EVEN THOUGH YOU SELL YOUR HOME.

(4) PROTECTION CONTINUES AFTER DEATH: Any surviving spouse, or other member of the deceased declared homestead owner's family, will be protected under the declared homestead providing (a) they are living in the dwelling at the time the declared homestead owner dies, and (b) they inherit all or part of the deceased owner's interest in the dwelling. This is true even if the surviving person was not listed in the Declaration of Homestead.

WILL MY HOMESTEAD DECLARATION PREVENT ME FROM REFINANCING MY PROPERTY? - No. Homestead Exemption does not apply to mortgages or deeds of trust placed on the property. You'll be free to refinance the property or obtain second and third deeds of trust.

CAN I REMOVE HOMESTEAD IF I WANT TO? - Yes. You may remove a homestead at any time by recording a form called Abandonment of Homestead. Also, if you change your principal place of residence and record a new Homestead, the first Homestead recorded would cease to exist by operation of law. When you sell your home, the homestead on it is automatically removed.

ARE THERE DISADVANTAGES TO RECORDING A DECLARATION OF HOMESTEAD? - No. Homestead is a valuable right given to you by law. By recording a Declaration of Homestead, you are exercising your right to protect your home to the maximum extent allowed by law.

WHAT SITUATIONS ARE NOT COVERED BY HOMESTEAD EXEMPTIONS?

1. Judgment liens recorded before you recorded your Declaration of Homestead will attach to your home (this is why it is wise to record your Declaration of Homestead as soon as possible).

2. Loans or debts secured by the property (mortgages, deeds of trust, etc.) are not covered by the Homestead Exemption. When you voluntarily use your home as security for a debt, Homestead Exemption usually will not protect you.

3. When a contractor puts labor or materials into repairs or improvements on your property and you do not pay him, Homestead Exemption will not protect against his mechanics' lien.

4. Homestead Exemption will not protect against a judgment for spousal, child suppport, or tax liens.

SOME ADDITIONAL BENEFITS OF RECORDING A DECLARATION OF HOMESTEAD

1. Your Homestead Declaration will prevent any judgment liens from attaching to the house - up to an amount equaling the total of most liens and encumbrances on the house and your Homestead Exemption: i.e., if your house is worth $100,000 with first and second mortgages totaling $80,000 and your Homestead Exemption as a married person is $45,000, judgment liens will not attach up to $125,000 (e.g., $80,000 plus $45,000).

2. If your have not homesteaded your home, and judgment liens have been filed against it, title insurance companies may not establish a clear title until all liens have been paid off. This may make it difficult, if not impossible, to sell your nonhomestead home.

3. If a creditor tries to force a sale of your home, with a Declaration of Homestead you'll have an important advantage over him in court. The creditor has the burden of proof to show why you should not be allowed the Homestead Exemption. Otherwise, the court will take your Declaration at its face value and grant you the exemption.

4. A recent court decision has established that property protected under a declared homestead may not be subjected to prejudgment attachment. A prejudgment attachment, if placed on your home, would make it virtually impossible to sell or refinance your home pending the outcome of the litigation.

WHAT IS THE PROCEDURE FOR RECORDING A DECLARATION OF HOMESTEAD?
- Just completed the enclosed retainer/information form and drop it in the mail. We will prepare the original documents for your signature and forward them to you with recording instructions. The cost for our service is $18.00.

NOTE: Please remit only $18.00 with your retainer information form to Morse & Associates. There will be a $5.00 recording fee (payable to the county recorder in your area), and a small fee (usually $2.00) to have your Homestead Declaration notorized.

MORSE & ASSOCIATES IS NOT AFFILIATED WITH ANY LENDING INSTITUTIONS.