[No. S046753. Dec. 18, 1995.]

In re JOHN MICHAEL BROWN on Discipline.

COUNSEL

Ephraim Margolin, Bradford L. Battson, Slatter & Slatter and Lindsay Kohut Slatter for Petitioner.

Diane C. Yu, Richard J. Zanassi, Mark Torres-Gil and Julie W. Stainfield for Respondent.

OPINION

THE COURT.*—On our own motion, we review an order of the State Bar Court publicly reproving John Michael Brown, an attorney admitted to practice in this state. The public reproval is based on Brown's conviction of three misdemeanor counts of failure to remit to the state certain funds withheld from the wages of his law corporation's employees (Unemp. Ins. Code, § 2118). The conduct underlying the convictions spanned more than two years and by the end of that period Brown had misappropriated approximately $36,000 in withheld wages that should have been paid to the state. In our order granting review, we directed that in their briefs the parties address "the adequacy of public reproval as discipline for the crimes of which John Michael Brown was convicted."

In this court, the State Bar's Office of Trial Counsel has argued that appropriate discipline in this case would include one year of actual suspension from the practice of law. For the reasons set forth below, we conclude that while public reproval is not adequate discipline, one year of actual suspension would be excessive, particularly in light of the demonstrated mitigating circumstances, including over twenty years of law practice without prior discipline. Accordingly, we shall order Brown suspended from the practice of law for two years and stay the suspension on conditions that include sixty days' actual suspension.

I

A. *Background*

Brown has no prior record of discipline. He was admitted to the practice of law in California on December 23, 1966. After admission, he was

---

*Before Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., Werdegar, J., and Ramirez, J.†

†Presiding Justice, Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

employed for one year as a superior court research attorney and for another year as a deputy district attorney. Brown then joined a law firm specializing in plaintiffs' personal injury litigation, eventually becoming a partner. Upon the firm's dissolution in 1978, Brown established a sole practice. In 1985, Brown incorporated his law practice as J. Michael Brown Professional Corporation.

## B. *Facts Underlying the Convictions*

As an employer that paid wages to employees (including Brown himself), Brown's law corporation was subject to this state's employment tax laws and registered as an employer with the Employment Development Department (EDD). Brown understood that his law corporation was legally obligated to withhold from the wages of its employees state income tax, employment training tax, disability tax, and unemployment insurance contributions, and to remit these withheld wages to the state on a quarterly basis, together with quarterly tax returns. From the beginning of his sole practice in 1978 through the first quarter of 1988, Brown withheld and timely paid all state taxes and submitted the required quarterly returns.

From April 1, 1988, through September 30, 1990, Brown withheld from the wages of his law corporation's employees the amounts required to satisfy state tax obligations, but he did not remit these funds to the state, nor did he submit any of the required quarterly returns. Instead of remitting the withheld wages to the state, Brown used this money to satisfy his personal debts. In all, Brown failed to remit $34,253.53 in state income and disability tax withholdings and $1,769.11 in unemployment insurance contributions and employment training taxes. During this period, the employees of Brown's law corporation included himself, a secretary, and a paralegal.[1] Most of the unremitted funds had been withheld from Brown's own salary, but the record does not disclose the exact allocation as between Brown's salary and those of the other employees.

On March 1, 1990, the EDD contacted Brown about the overdue quarterly returns for the second quarter of 1988 through the fourth quarter of 1989. Brown blamed the problem on his accountant,[2] and he promised to retain a new accountant and to give the EDD a progress report no later than March 9, 1990. On May 11, 1990, the EDD telephoned Brown and left a message for him to contact the EDD. On July 19, 1990, the EDD was able to contact

---

[1] Brown terminated his paralegal's employment in "late 1990." By then Brown had already terminated his secretary's employment, but the record does not reveal when this occurred.

[2] Brown conceded at the hearing that none of the accountants he had retained at various times were responsible for his failure to timely file quarterly wage returns and to remit the withheld funds to the state.

Brown and advise him of his tax liability. Brown said he would call back after checking with his accountant. At a meeting on August 2, 1990, Brown paid $1,089.25 toward his tax liability and represented that he had no other funds with which to make further payment on this obligation. On August 7, 1990, Brown called the EDD to cancel a meeting scheduled for that day. He said he would submit the overdue returns later that week. On August 16, 1990, the EDD sent Brown a five-day demand letter for withheld taxes and contributions. On August 21, 1990, Brown told the EDD that he had received the demand letter and that he would submit the quarterly tax returns on August 28 or 29. On September 12, 1990, the EDD received, without further payment, the overdue quarterly returns through the fourth quarter of 1989.

The September 1990 submission did not include returns for the first and second quarters of 1990, which were then also overdue. Brown promised the EDD he would send these returns (together with a financial statement verifying his claimed inability to pay the underlying tax obligations) by October 5, 1990. He did not do so. On October 15, 1990, he told the EDD he would mail these documents the next day. He again failed to do so. On October 26, 1990, Brown told the EDD he was having difficulty contacting his accountant.

On November 14, 1990, Brown sent the EDD an incomplete financial statement. On December 15, 1990, he submitted, also without payment, the overdue wage returns for the first three quarters of 1990.

In January 1991, Brown was charged by criminal complaint with 10 counts of failing to account for and pay over wage withholdings for state taxes and contributions in violation of Unemployment Insurance Code section 2118.[3] In May 1991, Brown entered a plea of nolo contendere to three counts of violating Unemployment Insurance Code section 2118. The trial

---

[3]Unemployment Insurance Code section 2118 provides: "Any person or employer who, with or without intent to evade, fails to withhold, pursuant to Section 13020, or fails to pay over any tax withheld, is guilty of a misdemeanor and, upon conviction, shall be fined an amount not to exceed one thousand dollars ($1,000), or imprisoned for not more than one year, or both the fine and imprisonment, at the discretion of the court."

Unemployment Insurance Code section 13020, as here relevant, provides:

"(a) Every employer who pays wages to a resident employee . . . shall deduct and withhold from such wages, . . . for each payroll period, a tax computed in that manner as to produce, so far as practicable . . . a sum which is substantially equivalent to the amount of tax reasonably estimated to be due under Part 10 (commencing with Section 17001) of Division 2 of the Revenue and Taxation Code resulting from the inclusion in the gross income of the employee of the wages which were subject to withholding. The method of determining

court granted probation for a period of three years on conditions that included full restitution to the EDD and performing 1,000 hours of volunteer service. Brown completed restitution, including penalties and interest, in April 1992.

### C. *Mitigating Circumstances*

#### 1. *Health problems*

In late 1987, Brown began to experience frequent, painful, and severe diarrhea, associated with fatigue and weight loss.[4] Brown found it difficult to concentrate on his law practice and other obligations; he was constantly irritable. Because he feared the diagnosis would be cancer, and because he no longer had health insurance, Brown put off medical appointments and recommended diagnostic procedures. In January 1989, a gastroenterologist diagnosed Brown's condition as celiac sprue, a disorder characterized by malabsorption, abnormal small-bowel structure, and intolerance to gluten, a protein found in wheat and other cereal grains. Brown's health began to improve once he was placed on a gluten-free diet.

Brown's illness did not result in hospitalization or frequent medical consultations or treatments. Throughout the relevant period, Brown's work schedule and his community and professional activities continued at, or close to, their normal pace.

#### 2. *Financial difficulties*

In 1984, Brown finalized a structured settlement on behalf of a client under which Brown would receive deferred fees in the amount of $100,000 or more per year for five years. With these anticipated payments and an earning history of more than $100,000 per year in his sole practice, Brown felt sufficiently financially secure to embark on a project involving the purchase of a 5.3-acre parcel of land for $190,000 on which Brown planned

---

the amount to be withheld shall be prescribed by the Franchise Tax Board pursuant to Section 18663 of the Revenue and Taxation Code."

"(b) The department upon request may permit the use of accounting machines to calculate the proper amount to be deducted and withheld from such wages, if such calculation produces an amount substantially equivalent to the amount of tax required to be withheld under subdivision (a)."

[4] Brown testified that his weight dropped from 195 to 133 pounds. His character witness, John Gary Gwilliam, similarly testified that Brown "dropped 50 or 60 pounds off his frame . . . ." The medical records Brown submitted do not substantiate such a dramatic drop, however. They show his weight declining from 180 pounds in October 1987 to 172 pounds in March 1988, and 163 pounds in September 1988. In February 1989, Brown's weight was apparently 162 pounds (the last digit is difficult to read) and in June 1989 it was back to 181 pounds. A letter from Brown's personal physician, Dr. Glafkides, refers to a "thirty pound weight loss."

to build his 4,600-square-foot "dream home" with adjoining stables and barn. Brown and his second wife planned to operate the stables as a business to breed show quality Arabian horses. Brown had no previous experience in property development, construction, or breeding horses for profit. At the outset, Brown estimated the project's total cost at $475,000.

When he undertook this project, Brown had no long-term savings other than $37,000 in a pension plan, and he had a $1,000-per-month support obligation to his former wife and their children. Brown sold his existing house and invested the $70,000 proceeds in the project. He rented a trailer for his family to live in and moved it onto the property.

Construction began in April 1987. Brown soon experienced financial difficulties, which he attributed in part to unanticipated construction costs and in part to a decline in income from his law practice.

After noticing what he believed to be construction defects, Brown entered into a dispute with the general contractor. In August or September of 1987, the general contractor ceased work on the project and Brown took over the general contractor's duties himself. In December 1987, Brown brought suit against the general contractor for construction fraud, but he never recovered anything, apparently because the contractor went into bankruptcy. Brown completed construction on the house and moved his family into it during 1988. The entire project ended up costing over $700,000, instead of the anticipated $475,000.[5]

In September 1989, the bank from which Brown had obtained the construction loan for his project recorded a notice of foreclosure on its trust deed. To prevent foreclosure, Brown filed a chapter 11 reorganization petition in October 1989.

Brown attributed the decline in income from his law practice in part to the effects of his illness (celiac sprue) and in part to certain changes in the law that made it more difficult for plaintiffs' attorneys to settle personal injury cases. Among these changes were enactment of the Fair Responsibility Act of 1986 (Civ. Code, §§ 1431-1431.5), which abolished joint and several liability for noneconomic damages; introduction of the "fast track" system under the Trial Court Delay Reduction Act of 1986 (Gov. Code § 68600 et seq.), which, according to Brown, caused judges in Alameda County to delay trials of older cases; and the passage of a major insurance reform initiative

---

[5]Brown sold the property in 1992 for $830,000. Brown testified that the proceeds would be sufficient to pay off all his creditors, and he estimated the balance that would remain at $5,000 to $10,000.

measure (Proposition 103) in November 1988, which, according to Brown, caused insurance companies to delay settlements of personal injury claims.

Although Brown testified that his practice suffered because he was unable to obtain trial dates for his cases, he also testified that on at least two occasions when he did obtain trial dates he was unable to try the cases himself and turned them over to another attorney. Also, despite the alleged difficulties settling cases and obtaining trial dates, Brown's income remained substantial during the period in question. His salary draws from the corporate practice were $144,465 in 1987, $191,657 in 1988, $157,769 in 1989 (the last year of the structured settlement payments), and $78,699 in 1990. Also, the $37,000 Brown had invested in a pension plan had grown to $130,000 by 1991, when he withdrew $125,000 to pay his debts. Further, Brown felt sufficiently financially secure in 1989 to purchase a Chevrolet Suburban vehicle for $23,000.

### 3. *Other mitigating circumstances*

In mitigation, Brown also offered evidence, not disputed, of the following circumstances. The extent to which these circumstances are entitled to mitigating weight is considered later in this opinion.

From 1966 through 1977 or 1978, Brown was active with the Northern California Kidney Foundation, serving on the board of directors and as president of that organization. As president of the kidney foundation, Brown also served for two years on the board of directors of the Combined Health Agencies Drive.

From 1974 to 1986, Brown served as a reserve police officer and, without compensation, gave police officers and deputy sheriffs legal training and firearms instruction.

After opening his sole practice, Brown joined the Livermore Rotary Club and became involved in its Polio Plus Campaign, which raised funds for an international effort to provide children with free inoculations against polio and other diseases. Brown was in charge of this campaign beginning in 1987, but in 1988 he resigned from the Rotary Club after being criticized for not attending meetings and for failing to timely file financial reports concerning the club's fund-raising activities.

John Gary Gwilliam, a past president of the California Trial Lawyers (now California Consumer Attorneys) testified that Brown's character is excellent; that Brown has devoted much time and effort to serving the legal profession

through various attorney organizations (including California Trial Lawyers Association, Alameda County Lawyers Club, and Livermore Amador Valley Bar Association); that he is a very competent trial attorney; and that he is extremely conscientious, honest, and trustworthy in his dealing with his clients.

Brown submitted eight letters from attorneys attesting to his good character, and a similar letter from his personal physician.

Brown submitted a declaration stating that he did not intend to defraud the government or mislead his employees; that he has cooperated and been candid with the State Bar in its investigation of this matter; that he has acknowledged his misconduct and taken steps to ensure it will not be repeated; and that he has completed restitution.

D. *State Bar Court Proceedings*

On July 1, 1991, the Review Department of the State Bar Court commenced these proceedings by issuing an order (augmented on Aug. 8, 1991) directing the hearing department to determine whether Brown's convictions involved moral turpitude or other misconduct warranting discipline and, if so, to recommend the discipline to be imposed.

In April 1992, Brown and the State Bar's Office of Trial Counsel (OTC) entered into a partial stipulation as to facts and conclusions of law. Thereafter, the matter was tried to the hearing department over two days in July 1992. On September 25, 1992, the hearing judge issued a decision finding that Brown's criminal offenses, and the facts and circumstances surrounding them, "do not constitute moral turpitude nor sufficiently egregious misconduct to warrant discipline." The hearing judge ordered that no discipline be imposed and that the action be dismissed.

The OTC sought review in the review department. On August 3, 1993, the review department issued a decision finding that Brown's conduct, although not involving moral turpitude, was misconduct warranting discipline. The review department reversed the order dismissing the action and remanded to the hearing department for recommendation of the appropriate sanction.

The hearing department received additional evidence in the form of a declaration by Brown. Thereafter, on February 14, 1994, the hearing judge recommended that Brown receive a private reproval on conditions that he submit quarterly reports to a probation monitor for a two-year period, attend the State Bar's Ethics School, and pass the California Professional Responsibility Examination.

Once again, the OTC sought review in the review department. On February 3, 1995, the review department rejected the hearing judge's recommendation as to discipline and ordered that Brown be publicly reproved subject to the same conditions recommended by the hearing judge. On our own motion, we then granted review to determine the adequacy of public reproval as discipline for the misconduct on which Brown's criminal convictions were based.

II

We accept and adopt the conclusions of the review department that Brown's conduct did not involve moral turpitude but did involve "other misconduct warranting discipline." The only issue before this court is the appropriate form and degree of discipline for this misconduct. Before addressing that issue, however, we consider Brown's contention that the imposition of any discipline for conduct underlying his criminal conviction would violate the federal Constitution.

### A. *Double Jeopardy*

■ Brown contends that imposing professional discipline for conduct already punished by his criminal convictions and sentence would violate that part of the Fifth Amendment to the United States Constitution providing that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

Brown waived any defense of double jeopardy by not asserting it during the State Bar Court proceedings. (See *People* v. *Belcher* (1974) 11 Cal.3d 91, 96 [113 Cal.Rptr. 1, 520 P.2d 385] [plea of former jeopardy waived if not asserted in trial court].) In any event, we conclude that the defense does not apply.

We have rejected similar contentions in the past on the ground that the defense of double jeopardy applies only in criminal actions. (*In re Crooks* (1990) 51 Cal.3d 1090, 1100 [275 Cal.Rptr. 420, 800 P.2d 898]; *Hawkins* v. *State Bar* (1979) 23 Cal.3d 622, 628 [153 Cal.Rptr. 234, 591 P.2d 524].) Brown maintains, however, that recent decisions of the United States Supreme Court, including *Department of Revenue of Montana* v. *Kurth Ranch* (1994) 511 U.S. 767 [128 L.Ed.2d 767, 114 S.Ct. 1937] and *United States* v. *Halper* (1989) 490 U.S. 435 [104 L.Ed.2d 487, 109 S.Ct. 1892], have established that the double jeopardy defense is not limited to proceedings that are nominally criminal, but rather extends to any proceeding that results in the imposition of punishment for criminal conduct.

In *United States* v. *Halper, supra,* 490 U.S. 435, the federal government filed an action against an individual to obtain civil penalties for conduct that had formed the basis for the same individual's criminal conviction and sentence for Medicare fraud (18 U.S.C. § 287). The United States Supreme Court reasoned that whether the double jeopardy defense was available in that situation depended upon "the character of the actual sanctions imposed on the individual by the machinery of the state" (*United States* v. *Halper, supra,* 490 U.S. 435, 447 [104 L.Ed.2d 487, 501], fn. omitted) and that in making that determination "the labels 'criminal' and 'civil' are not of paramount importance" (*ibid.*). After a criminal conviction and sentence, an additional sanction may be imposed for the same conduct without violating the federal Constitution's double jeopardy provision if the sanction may fairly be characterized as "remedial," but not if the sanction functions as "a deterrent or retribution." (*Id.* at pp. 448-449 [104 L.Ed.2d at p. 502].) A monetary sanction is "remedial" if it merely reimburses the government for its actual costs arising from the defendant's criminal conduct. (*Id.* at pp. 449-450, 452 [104 L.Ed.2d at pp. 502-503, 504].) The court remanded to the district court to determine what portion of the statutory penalty acted as compensation for the government's actual damages. (*Id.* at p. 452 [104 L.Ed.2d at p. 504].)

In *Department of Revenue of Montana* v. *Kurth Ranch, supra,* 511 U.S. 767, the State of Montana sought to impose a special tax on the possession and storage of dangerous drugs against certain individuals who had been convicted and criminally punished for illegal drug possession. Noting that "a tax is not immune from double jeopardy scrutiny simply because it is a tax" (*id.* at p. __ [128 L.Ed.2d at p. 779, 114 S.Ct. at p. 1946]) and that "at some point, an exaction labeled as a tax approaches punishment" (*ibid.*), the United States Supreme Court concluded that because the amount of the tax was eight times the market value of the drugs (*ibid.*), because "this so-called tax is conditioned on the commission of a crime" (*id.* at p. __ [128 L.Ed.2d at p. 779, 114 S.Ct. at p. 1947]), and because the tax was assessed only after the illegal drugs had been confiscated and presumably destroyed (*id.* at p. __ [128 L.Ed.2d at p. 781-782, 114 S.Ct. at p. 1948]), the tax had "an unmistakable punitive character" (*ibid.*). Characterizing the proceeding by which the tax was imposed as "the functional equivalent of a successive criminal prosecution," the court held that the tax violated the Fifth Amendment's double jeopardy provision. (*Ibid.*)

These cases are distinguishable. The discipline imposed in attorney discipline proceedings following criminal conviction is not "punishment" for purposes of the Fifth Amendment's double jeopardy provision. Such discipline is imposed only if the criminal conduct reflects directly and adversely

on the attorney's fitness to practice law. (See *In re Johnson* (1992) 1 Cal.4th 689, 698-699 (maj. opn.), 705-706 [4 Cal.Rptr.2d 170, 822 P.2d 1317] (conc. and dis. opn. of Kennard, J.); *In re Kelley* (1990) 52 Cal.3d 487, 494-497 [276 Cal.Rptr. 375, 801 P.2d 1126].) Attorney discipline does not take the form of traditional criminal sanctions, such as monetary fines or incarceration, but rather consists of reproval, suspension from the practice of law, or disbarment. Finally, the aim of attorney discipline is not punishment or retribution; rather, attorney discipline is imposed to protect the public, to promote confidence in the legal system, and to maintain high professional standards. (*Baker* v. *State Bar* (1989) 49 Cal.3d 804, 822 [263 Cal.Rptr. 798, 781 P.2d 1344]; *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 198 [242 Cal.Rptr. 196, 745 P.2d 917].) We therefore reject Brown's belated defense of double jeopardy. (Accord, *People* v. *Marmon* (Colo. 1995) 903 P.2d 651, 655.)

### B. *Adequacy of Recommended Discipline*

In determining appropriate discipline, we are guided by (1) the recommendation of the review department (*In re Billings* (1990) 50 Cal.3d 358, 366 [267 Cal.Rptr. 319, 787 P.2d 617]), (2) the discipline this court has imposed for similar misconduct in past cases (*Van Sloten* v. *State Bar* (1989) 48 Cal.3d 921, 933 [258 Cal.Rptr. 235, 771 P.2d 1323]; *Rodgers* v. *State Bar* (1989) 48 Cal.3d 300, 318 [256 Cal.Rptr. 381, 768 P.2d 1058]), and (3) the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V, Stds. for Prof. Misconduct; all further references to standards are to this source) (see *In re Naney* (1990) 51 Cal.3d 186, 190 [270 Cal.Rptr. 848, 793 P.2d 54]).

Although we generally give great weight to the review department's recommendation, the ultimate decision rests with this court. (*In re Morse* (1995) 11 Cal.4th 184, 205 [44 Cal.Rptr.2d 620, 900 P.2d 1170].) By granting review on our own motion in this case, we have indicated reservations about the level of discipline that the review department intended to impose. To determine whether those reservations are justified, we will examine the relevant prior decisions and standards.

### 1. *Past cases involving similar misconduct*

The earliest decision involving misconduct similar to that presented in this case is *In re Fahey* (1973) 8 Cal.3d 842 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465]. There, an attorney was convicted of willfully failing to file federal income tax returns for three years (26 U.S.C. § 7203.) We concluded that the attorney discipline proceeding should be dismissed because the crime did not involve moral turpitude inasmuch as the attorney's

failure to file tax returns did not involve acts of deception and "was not for the purpose of personal financial gain or with intent to avoid ultimate payment of his tax obligations." (*In re Fahey, supra,* 8 Cal.3d at p. 846.)

Five years later, in *In re Rohan* (1978) 21 Cal.3d 195 [145 Cal.Rptr. 855, 578 P.2d 102], this court concluded that virtually identical misconduct did warrant attorney discipline. The attorney had failed to file timely federal income tax returns for the years 1964 through 1970, and had been convicted of willful failure to file his income tax return (26 U.S.C. § 7203). The attorney's criminal misconduct was not accompanied by acts of deception, nor did the attorney intend to permanently avoid payment of taxes. We imposed a two-year suspension, stayed, and a two-year probation on conditions that included a sixty-day actual suspension.

There was no majority in that case. The lead opinion by Justice Clark, joined by Justice Richardson, concluded that although the attorney's misconduct did not involve moral turpitude, it did constitute a violation of the attorney's oath and thus was "other misconduct warranting discipline." (*In re Rohan, supra,* 21 Cal.3d 195, 201-203.) Justice Clark observed that imposing professional discipline for willful failure to timely file tax returns "is in accord with the heavy weight of authority in those sister states speaking to the issue [citation] and the recommendation of the American Bar Association, as promulgated by the Standing Committee on Professional Discipline in its 1974 Suggested Guidelines for Rules of Disciplinary Enforcement." (*Id.* at p. 204.)

In a concurring and dissenting opinion joined by Justice Mosk, Justice Tobriner argued that "moral turpitude" should be construed to include any conduct by an attorney indicating unfitness to practice and that willful failure to file tax returns satisfied this definition. (*In re Rohan, supra,* 21 Cal.3d 195, 205-206 (conc. and dis. opn. of Tobriner, Acting C. J.).) He reasoned that the "maintenance of clear and accurate financial records and the preparation and filing of timely tax returns closely parallel the duties of a practicing attorney" and therefore the attorney's "carelessness in these matters suggests that, for the protection of clients, his practice should be subject to probationary supervision by the State Bar." (*Id.* at p. 206.)

Justice Sullivan wrote a brief concurring and dissenting opinion, in which Justice Wright joined, agreeing with the result but not with the "purported formulation of general bases for discipline in this area, couched in vague language and fashioned from nebulous 'suggestions' in the statutory and case law." (*In re Rohan, supra,* 21 Cal.3d 195, 206-207 (conc. and dis. opn. of Sullivan, J.).)

We next consider our decision in *In re Morales* (1983) 35 Cal.3d 1 [196 Cal.Rptr. 353, 671 P.2d 857]. There, the attorney had been convicted of "27 misdemeanor offenses involving the failure to withhold or pay certain payroll taxes and unemployment insurance contributions. (See Rev. & Tax. Code, § 19409; Unemp. Ins. Code, §§ 2108, 2110, 2110.5.)" (*In re Morales, supra,* at p. 3.) The misconduct occurred during "five quarters in the years 1976 and 1977." (*Id.* at p. 4.) This court imposed an 18-month suspension, stayed, and probation on conditions including no actual suspension. Agreeing with the review department that the acts and omissions on which the convictions were based constituted "other misconduct warranting discipline," we stated:

"Petitioner, having paid his employees only their 'net' wages, appears to have misused funds held in trust for those employees. Petitioner had the duty, as an employer and a trustee, to withhold the proper payroll deductions and to pay them to the state. (Unemp. Ins. Code, §§ 986, 2110.5.) The monies withheld belonged to the employees, not to petitioner or his corporation. By failing to maintain the withheld funds in trust for his employees, petitioner in essence commingled those funds with his own and misappropriated them for his own benefit.[6] We find no justification for petitioner's misconduct. His reasons for failing to pay the taxes differ little in kind or degree from those confronting many a harried taxpayer, who would not be relieved thereby from such obligation.

"Petitioner made an illegal business decision concerning the allocation of available funds between competing obligations. It is reasonably foreseeable that petitioner's legal advice could be solicited by clients in similar circumstances, and we have grave doubts whether the advice he would offer would be sound in view of petitioner's apparent failure even now to recognize that what he did was not justified simply because no 'excess funds' existed with which to pay the state." (*In re Morales, supra,* 35 Cal.3d 1, 6.)

This court's most recent attorney discipline case involving a conviction for a tax-related criminal offense is *In re Grimes* (1990) 51 Cal.3d 199 [270 Cal.Rptr. 855, 793 P.2d 61]. There, the attorney pleaded guilty to three counts of willfully failing to file a tax return in violation of Revenue and Taxation Code section 19401. (*In re Grimes, supra,* at p. 200.) We concluded

---

[6]Brown argues that this reasoning does not apply to his conduct because most of the unremitted funds had been withheld from his own salary. We disagree. By implication, Brown concedes, correctly, that this reasoning is fully applicable to that portion of the unremitted funds that had been withheld from the salary of Brown's secretary and paralegal, and Brown has not shown that this amount was insignificantly small. Moreover, we have imposed suspension as a discipline for an attorney's willful failure to report and pay taxes on his or her own income. (See, e.g., *In re Rohan, supra,* 21 Cal.3d 195.)

that the attorney's conduct "did not involve moral turpitude but did involve other misconduct warranting discipline," and we followed the review department's recommendation of a two-year suspension, stayed, with a two-year probation on conditions including a sixty-day actual suspension. (*Id.* at pp. 200-201.)

 Consideration of past cases involving similar misconduct indicates that, at least in the absence of compelling mitigation, an attorney's willful failure, for a period of 2 years, to account for and pay over to the state the funds required to be withheld from employee wages for state tax obligations, without deceptive acts or an intent to permanently avoid payment, is "other misconduct warranting attorney discipline," for which the appropriate sanction is suspension from the practice of law for a period in the range of 18 months to 2 years, stayed, with a probationary period in the range of 18 months to 2 years, and an actual suspension of 60 days or less.

### 2. *Standards*

 Although the attorney discipline standards are not binding on this court, we generally give them "great weight" because, as we have acknowledged, "adherence to the standards in the great majority of cases serves the valuable purpose of eliminating disparity and assuring consistency, that is, the imposition of similar attorney discipline for instances of similar attorney misconduct." (*In re Naney, supra,* 51 Cal.3d 186, 190; accord, *In re Morse, supra,* 11 Cal.4th 184, 206.) In this case, however, the standards provide little guidance as to the appropriate degree of discipline.

Standard 3.4 provides: "Final conviction of a member of a crime which does not involve moral turpitude inherently or in the facts and circumstances surrounding the crime's commission but which does involve other misconduct warranting discipline shall result in a sanction as prescribed under part B of these standards appropriate to the nature and extent of the misconduct found to have been committed by the member." When we look to part B of the standards, however, we find no standard specifying the appropriate discipline for failure to account for and pay over to the state payroll tax withholdings.

As noted above, in *In re Morales, supra,* 35 Cal.3d 1, 6, this court referred to virtually identical misconduct as commingling and misappropriation of entrusted funds. This would suggest that the most relevant standard is standard 2.2, which states:

"(a) Culpability of a member of wilful misappropriation of entrusted funds or property shall result in disbarment. Only if the amount of funds or

property misappropriated is insignificantly small or if the most compelling mitigating circumstances clearly predominate, shall disbarment not be imposed. In those latter cases, the discipline shall not be less than a one-year actual suspension, irrespective of mitigating circumstances.

"(b) Culpability of a member of commingling of entrusted funds or property with personal property or the commission of another violation of [former] rule 8-101 [now rule 4-100], Rules of Professional Conduct, none of which offenses result in the wilful misappropriation of entrusted funds or property shall result in at least a three month actual suspension from the practice of law, irrespective of mitigating circumstances."

There are two difficulties with application of standard 2.2 to this case.

First, there is a significant factual distinction between this case and *In re Morales*, *supra*, 35 Cal.3d 1. In *Morales*, the attorney was convicted of violating Unemployment Insurance Code section 2110.5, which makes it a misdemeanor for an employer to willfully fail "to withhold *in trust* the deductions" for unemployment insurance. Brown, by comparison was convicted of violating Unemployment Insurance Code section 2118, which makes no reference to withholding funds "in trust." (See fn. 3, *ante*.) Thus, Brown's conviction does not establish that he is guilty of misappropriating "entrusted funds" in the sense meant by the rule, and his misconduct, although criminal, is distinguishable from and at least arguably less serious than an attorney's misappropriation of entrusted client funds, and perhaps more nearly equivalent in seriousness to an attorney's commingling of entrusted client funds with those of the attorney.

Second, this court has expressed dissatisfaction with standard 2.2(a) insofar as it precludes discipline less severe than a one-year actual suspension, going so far as to state that it is "not faithful to the teachings of this court's decisions." (*Edwards* v. *State Bar* (1990) 52 Cal.3d 28, 38 [276 Cal.Rptr. 153, 801 P.2d 396]; accord, *Kelly* v. *State Bar* (1991) 53 Cal.3d 509, 518 [280 Cal.Rptr. 298, 808 P.2d 808]; *Brockway* v. *State Bar* (1991) 53 Cal.3d 51, 66-67 [278 Cal.Rptr. 836, 806 P.2d 308]; *Howard* v. *State Bar* (1990) 51 Cal.3d 215, 221-222 [270 Cal.Rptr. 856, 793 P.2d 62].) We have stressed that willful misappropriation "covers a broad range of conduct varying significantly in the degree of culpability." (*Edwards* v. *State Bar*, *supra*, at p. 38.)

Although the standards are of limited utility in this particular case, they do suggest that the level of discipline recommended by the review department —public reproval—is inadequate. To determine the exact level of discipline

to impose in this case, we now consider the alleged mitigating circumstances.

### 3. *Mitigating circumstances*

■ Before the misconduct underlying his criminal convictions, Brown practiced law in this state for more than 20 years without any disciplinary record. An unblemished record over such a long period of time is considered an important mitigating circumstance. (*Kelly* v. *State Bar*, *supra*, 53 Cal.3d 509, 520; see also std. 1.2(e)(i).)

During part of the time Brown's criminal conduct was occurring, he was suffering from an illness, celiac sprue. Standard 1.2(e) lists as a mitigating circumstance "(iv) extreme emotional difficulties or physical disabilities suffered by the member at the time of the act of professional misconduct which expert testimony establishes was directly responsible for the misconduct; provided that . . . the member has established through clear and convincing evidence that he or she no longer suffers from such difficulties or disabilities." (See also *Smith* v. *State Bar* (1984) 37 Cal.3d 17, 25 [206 Cal.Rptr. 545, 687 P.2d 259].) Although Brown offered no expert testimony to establish that his illness was "directly responsible" for his misconduct, the OTC did not dispute his testimony that the effects of his illness, including weight loss, sleeplessness, and fear that he had contracted a terminal illness, to some extent impaired his judgment and affected his ability to deal appropriately with the financial pressures he was experiencing, and that the changes in his diet will effectively prevent recurrence of these symptoms. We are therefore inclined to give this circumstance some mitigating weight. Yet we note also that the duration of the acute phase of Brown's illness is attributable at least in part to Brown's own procrastination (that is, his failure to promptly obtain a diagnosis), that the acute phase of the illness appears to have lasted no more than six months (the latter half of 1988), and that the illness was perhaps not as debilitating as he has claimed.

■ Financial difficulties may be a mitigating factor in attorney discipline proceedings, but only if they "are extreme and result from circumstances that are not reasonably foreseeable or that are beyond the attorney's control." (*In re Naney*, *supra*, 51 Cal.3d 186, 196; accord, *Grim* v. *State Bar* (1991) 53 Cal.3d 21, 31-32 [278 Cal.Rptr. 682, 805 P.2d 941]; *Amante* v. *State Bar* (1990) 50 Cal.3d 247, 254-255 [266 Cal.Rptr. 648, 786 P.2d 375].) ■ We accord but little weight to the evidence of Brown's financial problems. The difficulties he encountered in constructing his "dream home" appear largely the result of embarking upon an ambitious construction

scheme with inadequate financial resources, insufficient experience or expertise, and an unrealistic appraisal of the potential costs.[7] Changes in law that may have adversely affected Brown's law practice were unforeseeable and uncontrollable and to that extent mitigating, but it is unclear how much of the decline in Brown's income is attributable to these changes rather than to Brown's preoccupation with his construction project. Moreover, even if we accept that some decline in Brown's income occurred, that income was still substantial during the period in question.

Another recognized mitigating circumstance is evidence of good character in the form of testimony or letters from individuals in the legal and general communities, provided that these individuals are aware of the full extent of the attorney's misconduct. (Std. 1.2(e)(vi); *In re Ford* (1988) 44 Cal.3d 810, 818 [244 Cal.Rptr. 476, 749 P.2d 1331].) Here, as we have seen, Brown offered the testimony of one attorney and letters from eight other attorneys, but only a few of these letters establish that the writers were aware of the full extent of Brown's misconduct. Brown also submitted evidence of his good character in the form of his record of service to the legal profession and the general community. (See *Rose* v. *State Bar* (1989) 49 Cal.3d 646, 667 [262 Cal.Rptr. 702, 779 P.2d 761].) Accordingly, Brown's demonstration of good character is entitled to consideration as a mitigating circumstance.

We also give some mitigating weight to evidence that Brown was candid and cooperative during the disciplinary proceeding (std. 1.2(e)(v)), and that he has acknowledged wrongdoing and taken steps to prevent its recurrence (std. 1.2(e)(vii)).

Because Brown completed restitution only under threat or compulsion of criminal proceedings, we do not treat this fact as mitigating. (*Howard* v. *State Bar, supra*, 51 Cal.3d 215, 222; *In re Naney, supra*, 51 Cal.3d 186, 196.)

In view of the demonstrated mitigating circumstances in this case, we will not impose a greater degree of discipline than we have imposed in past cases involving similar misconduct. But neither shall we impose a significantly lesser degree of discipline.

---

[7]For example, Brown testified that he had relied on the general contractor's estimate of $4,000 for Sheetrock, only to discover later that it cost $12,000. Apparently, the Sheetrock was not included in the general contractor's bid, because the general contractor agreed only to construct the "shell" of the house, and Brown intended from the outset to do all the interior finish work himself. In this context, reliance on the gratuitous estimate of the general contractor was not reasonably prudent.

### 4. *Conclusion*

We conclude that public reproval is inadequate discipline for the misconduct underlying Brown's criminal convictions. Giving due consideration to the mitigating evidence, we conclude that the discipline hereafter ordered is appropriate.

DISPOSITION

John Michael Brown is suspended from the practice of law in the State of California for two years from the date this decision is final. Execution of the order of suspension is stayed and Brown is placed on probation for two years, subject to the following conditions:

1. Brown is placed on actual suspension from the practice of law in California during the first 60 days of probation.

2. During the period of probation, Brown shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California.

3. Brown shall be supervised by a probation monitor assigned by the Probation Unit, Office of Trials. Brown shall promptly review the terms and conditions of his probation with the monitor to establish a manner and schedule of compliance consistent with the terms of Brown's probation. During the probation, Brown shall timely furnish such reports as may be requested by his monitor. Brown shall cooperate fully with his monitor to enable the monitor to discharge his or her duties pursuant to rule 611 of the Rules of Procedure of the State Bar. During the period of probation, Brown shall report not later than January 10, April 10, July 10, and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Probation Unit, Office of Trials, San Francisco, which report shall state that it covers the preceding calendar quarter or applicable portion thereof, and certifying by affidavit or under penalty of perjury (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, he shall file said report on the due date next following the due date after said effective date):

(a) in his first report, whether he has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation;

(b) in each subsequent report, whether he has complied with all provisions of the State Bar Act and Rules of Professional Conduct;

(c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph certifying to the matters set forth in subparagraph (b) thereof.

4. Subject to the valid assertion of applicable testimonial privileges, Brown shall answer fully, promptly, and truthfully any inquiries of the Probation Unit, Office of Trials, and any probation monitor assigned under these conditions of probation, which inquiries are directed to Brown either orally or in writing and which relate to whether Brown is complying with the terms of his probation.

5. Brown shall promptly report, and in no event less than 10 days after this court's decision becomes final, to the membership records office of the State Bar and to the Probation Unit, Office of Trials, any change of Brown's address or telephone number as required by Business and Professions Code section 6002.1.

6. Brown shall take and pass the Professional Responsibility Examination during the first year of his probation.

The period of probation shall begin on the date this order becomes effective. This order is effective on finality of decision in this court. (See Cal. Rules of Court, rule 24(a).) Brown shall pay costs as required by Business and Professions Code section 6086.10.